## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 03-1192 (ESH) |
| UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Dated:  September 25, 2003

Of Counsel:

HUGO TEUFEL, III
Associate Solicitor

TIMOTHY MURPHY
Attorney-Adviser

Office of the Solicitor
Division of General Law
U.S. Dep't of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

WILLIAM E. GRESSMAN
Senior Associate General Counsel

ELAINE NEWTON
Attorney-Advisor

U.S. Office of Government Ethics
1201 New York Avenue, N.W.
Washington, D.C.  20005-3917

PETER D. KEISLER
Assistant Attorney General

ROSCOE C. HOWARD, JR.
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

JAMES J. GILLIGAN
Senior Trial Counsel

U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
(202) 514-3358

Counsel for Defendants United States
Department of the Interior and the United States
Office of Government Ethics

## TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Ethics Laws and Regulations Applicable to Federal Officials
      and Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      The FOIA Request to the Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      The FOIA Request to OGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      Plaintiffs' Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.     HAVING COMPLIED WITH THE FOIA, BOTH DEFENDANTS
       ARE ENTITLED TO SUMMARY JUDGMENT ON CLAIMS
       ONE AND TWO OF THE COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     A.    Standards for Summary Judgment in FOIA Cases . . . . . . . . . . . . . . . . 13

     B.    Both DOI and OGE Conducted Reasonable Searches
         for Responsive Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     C.    DOI and OGE Properly Withheld Workpapers Generated
         During the Preparation and Review of Public Financial
         Disclosure Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         1.    The 278 workpapers are deliberative material that
             is excepted from disclosure by FOIA Exemption 5 . . . . . . . . . . 18

         2.    The 278 workpapers are also subject to withholding
             under Exemption 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     D.    DOI and OGE Properly Withheld Drafts and Other Memoranda
         Related to Mr. Griles' Ethics Agreement . . . . . . . . . . . . . . . . . . . . . . . 29

E.    Defendants Acted in Accordance With the FOIA When They
      Refused To Release Their Inter-Agency Deliberations
      Concerning Mr. Griles' Compliance With the Ethics Laws .......... 32

F.    DOI Properly Withheld Confidential Financial Disclosure
      Reports That the Ethics in Government Act Prohibits
      Agencies from Releasing ..................................... 35

G.    The Department Appropriately Withheld Confidential
      Commercial Information Voluntarily Provided to
      DOI by Mr. Griles' Former Employer  ......................... 37

H.    OGE Complied With the FOIA When It Withheld Records
      Compiled for Law Enforcement Purposes  ...................... 40

I.    OGE Properly Redacted Home Telephone Numbers,
      Addresses, and Related Information  ........................... 42

J.    DOI and OGE Properly Redacted Non-Responsive Information  ...... 43

K.    DOI and OGE Both Complied With Their Obligation To
      Release Reasonably Segregable, Non-Exempt Material
      from Withheld Records ...................................... 44

II.   CLAIMS THREE AND FOUR OF THE COMPLAINT SHOULD
      BE DISMISSED ............................................... 46

CONCLUSION ..................................................... 48

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 03-1192 (ESH) |
| UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs, Defenders of Wildlife, Friends of the Earth, and the Endangered

Species Coalition, brought this action seeking to compel the release of documents

responsive to two Freedom of Information Act ("FOIA") requests submitted, respectively,

to the Department of the Interior ("DOI," or the "Department") and the United States

Office of Government Ethics ("OGE"). Plaintiffs' underlying FOIA requests were

animated by an apparent perception on plaintiffs' part that the Deputy Secretary of the

Interior, J. Steven Griles, may not have adhered to various recusals, and other

commitments he made under ethics laws and regulations, in order to avoid potential or

apparent conflicts of interest.

Claims One and Two of plaintiffs' Complaint for Declaratory Judgment and Injunctive Relief, filed June 3, 2003 (the "Complaint") assert that defendants failed to abide by the FOIA's disclosure obligations in responding to their FOIA requests. Following the submission of plaintiffs' requests, however, defendants DOI and OGE conducted thorough searches for responsive documents, and thereafter released all responsive, non-exempt documents to plaintiffs. The only information that has been withheld from plaintiffs is properly excepted from disclosure under one or more of FOIA's nine exemptions, 5 U.S.C. § 552(b)(1)-(9). That being the case, defendants are entitled to summary judgment on Claims One and Two.

Claims Three and Four of the Complaint should be dismissed for failure to state claims upon which relief can be granted. There, plaintiffs complain that defendants did not provide them with "<u>Vaughn</u>" indices when they responded to their FOIA requests, and that defendants did not meet applicable statutory deadlines for responding to their various requests and appeals. The FOIA does not entitle a requester to a <u>Vaughn</u> index during administrative processing, however, and plaintiffs have already exercised their statutory remedy for defendants' failure to meet the FOIA's deadlines by bringing this lawsuit. Defendants are therefore entitled to judgment as a matter of law.

2

## BACKGROUND

### Ethics Laws and Regulations Applicable to Federal Officials and Employees

A brief survey of relevant ethics laws and regulations governing the official

conduct of federal officers and employees will be useful to understanding both the nature

of the documents plaintiffs have requested, and the bases for defendants' withholdings.

Generally speaking, federal law has long prohibited officers or employees of the

government from participating substantially in particular matters, through decision,

approval, or otherwise, in which they (or individuals whose interests are imputed to them)

have a financial interest. 18 U.S.C. § 208(a); 5 C.F.R. § 2635.402(a), (c), (e). Federal

regulations also establish standards of ethical conduct that prohibit federal employees, for

example, from holding financial interests or positions outside the government that would

require them to withdraw from matters central to the performance of their duties, 5 C.F.R.

§§ 2635.403, 2635.802; or from participating in particular matters in which certain family

members or business associates are involved. Id., §§ 2635.502(a), 2635.503(a).

In addition to these standards of ethical conduct, the Ethics in Government Act of

1978, Pub. L. No. 95-521 (codified as amended at 5 U.S.C. App. 4) (the "EIGA," or

"Ethics Act") establishes a system of public financial disclosure by senior Executive

Branch officials and nominees. See 5 U.S.C. App. 4 §§ 101-111. The Ethics Act

requires senior Executive Branch officials (generally those classified at a grade above

GS-15), and nominees to positions requiring Senate confirmation, to file public financial

3

disclosure reports, known as forms SF-278, <u>see</u> 5 C.F.R. § 2634.601, which (briefly

stated, and subject to various reporting thresholds and exclusions) must include detailed

information about the sources and amount of filing officials' or nominees' income above

$200; their property interests exceeding $1,000; and certain debts exceeding $10,000.

Filing officials and nominees must also describe purchases or sales of real property or

securities over $1,000; identify outside positions and certain sources of compensation

exceeding $5,000; and describe any agreements or arrangements for future employment

or continued compensation by former employers.  5 U.S.C. App. 4 §§ 101(a), 102(a);

5 C.F.R. Part 2634, Subpart C; Declaration of Shayla Freeman Simmons, dated

September 25, 2003 ("Simmons Decl.") (filed herewith), ¶ 4; Declaration of Stuart D.

Rick, dated September 25, 2003 ("Rick Decl.") (filed herewith), ¶ 5.

The purposes of these disclosures are twofold.  First, to support "public

confidence in the integrity of top government officials," federal agencies must make

official financial disclosure reports available to the members of the public on request, so

the public "[may] judge the performance of public officials . . . in light of [their] outside

financial interests," S. Rep. No. 170, 95th Cong., 1st Sess. 21-22 (1977), <u>reprinted</u> <u>in</u>

1978 U.S.C.C.A.N. 4216; 5 U.S.C. App. 4 § 105(a), (b)(1).  Second, "to deter conflicts of

interest from arising," S. Rep. No. 95-170 at 22, official disclosure is used to detect and

prevent conflicts of interest and other violations of ethics laws and regulations by high-

level officials or nominees, through systematic review of their reported financial interests. 5 U.S.C. App. 4 § 106(b); Rick Decl., ¶ 6; Simmons Decl., ¶ 3.

Within the Executive Branch, OGE has "primary responsibility for implementing the financial disclosure provisions . . . and for coordinating policies and monitoring enforcement" of the ethics laws. S. Rep. No. 95-170 at 46. OGE is responsible for overseeing the development and enforcement of rules pertaining to standards of ethical conduct, including conflicts of interest; the review and certification of financial disclosure reports by high-level officials and nominees; and directing corrective action by agencies or employees to prevent or remedy conflicts of interest or other ethics-related problems that such review might reveal. 5 U.S.C. App. 4 § 402(b), (f). Individual agencies must also establish and maintain their own ethics programs, for purposes of ethics education and counseling; coordination with OGE; the review and certification of financial disclosure reports required by the Act; and taking action to remedy any real, potential or apparent conflicts of interest, or other violations of applicable standards of ethical conduct, by their employees. 5 C.F.R. §§ 2638.201, 2638.203; see Simmons Decl., ¶ 3.

Pursuant to these authorities, federal agencies, and (in cases of certain very high-level officials and nominees) OGE, conduct reviews of public financial disclosure reports after they are submitted. If after review of a report the agency and/or OGE concludes that additional information is required to satisfy the reporting requirements of the Act, the filer is so notified and requested to submit the additional information needed. Once the

5

agency and OGE are satisfied that the report contains all of the information required under the EIGA, reviewing officials evaluate whether the information disclosed in the report presents a real, potential or apparent conflict of interest, or an ethics-related issue of some other kind.  If it is so determined, the agency and OGE then must decide what corrective action is necessary on the filing official's or nominee's part, choosing from a menu of options including divestiture of a conflicting interest, establishment of a blind trust, resignation from an outside position or organization, or recusal from particular matters.  See generally 5 U.S.C. App. 4 § 106; Rick Decl., ¶¶ 7-9.  Once that decision has been made, the filing official or nominee usually enters into a so-called "ethics agreement," in which he or she commits to taking specific actions (such as divestiture, resignation or recusal), within a set a time, to alleviate the identified conflict or other ethics-related issue.  See Rick Decl., ¶ 9; 5 C.F.R. § 2634.802.

### The FOIA Request to the Department

On September 25, 2002, Defenders of Wildlife and Friends of the Earth submitted a FOIA request to the Department for five categories of documents pertaining to three individuals employed by DOI (the "DOI Request").  Declaration of Sue Ellen Sloca, dated September 25, 2003 ("Sloca Decl.") (filed herewith), ¶ 3 & Exh. A.  These individuals were J. Steven Griles, the Deputy Secretary of the Interior, his Special Assistant, Holly Hopkins, and James Cason, Associate Deputy Secretary of the Interior.  Id., ¶ 3 & Exh. A at 1.  The documents sought included:

6

(i)     all public financial disclosure reports, forms SF 278, filed by these individuals;

(ii)    any documents relating to their financial interests;

(iii)   any documents relating to their ethics agreements, including recusals, divestitures, or resignations;

(iv)    all documents relating to contracts, agreements or communications between Mr. Griles and his former firms, employers, or clients; and

(v)     any documents relating to these individuals generated pursuant to the disclosure provisions, conflict of interest rules, and standards of ethical conduct, under 5 C.F.R. Parts 2634, 2635 and 2640.

As background to their request, plaintiffs alluded to an April 12, 2002 memorandum that Mr. Griles wrote to the Environmental Protection Agency ("EPA"), concerning its review of environmental impact statements on proposed coalbed methane mining in Wyoming. They observed that the interests of several clients that Mr. Griles represented prior to becoming Deputy Secretary could be affected by that review.  Sloca Decl., Exh. A at 2-3.

Upon receipt of plaintiffs' request, the Department's FOIA Officer immediately examined the request, and determined, given the nature of the materials sought, that the documents responsive to the request were most likely to be found in two places:  either the Secretary's Immediate Office, where the three individuals named in the request were employed, or the Department Ethics Office, which is responsible for management of DOI's ethics program. See supra at 5.  Accordingly, plaintiffs' request was referred to the Secretary's Immediate Office, and, in turn, the Ethics Office, to conduct searches for responsive documents.  Sloca Decl., ¶ 3.

7

The Ethics Office performed a search for records responsive to the request, and afterward forwarded copies of the responsive material it located to the Department FOIA Officer for processing and release.  Sloca Decl., ¶ 4.  The Secretary's Immediate Office ascertained, in the meantime, that Mr. Griles, Ms. Hopkins, and Mr. Cason were themselves the only employees within that office who were likely to have records responsive to the request.  Sloca Decl., ¶ 3.  It was determined through consultation with these individuals, however, that they had no responsive documents in addition to those already located by the Ethics Office, either because they had not generated any responsive documents, or had done so prior to commencing employment at the Department (meaning the documents had not come within the Department's control).  Id., ¶ 4.  Thus, all documents located in response to the request came from the Ethics Office, with the search concluding on November 14, 2002.  Id.

On December 6, 2002, the Department provided plaintiffs with copies of public financial disclosure reports filed by Mr. Griles, Mr. Cason and Ms. Hopkins, as these particular documents were at that time ready for release.  DOI continued to process the documents responsive to the remainder of plaintiffs' request.  Sloca Decl., ¶ 5 & Exh. C.[1] Processing was completed in early January 2003, and the Department forwarded 32 pages

---

[1] Plaintiffs thereafter notified the Department that Mr. Griles' annual SF 278 for 2001 was not among the reports included with DOI's interim response.  On January 3, 2003, DOI sent plaintiffs a copy of Mr. Griles' report for 2001, which had been inadvertently omitted from the December 6, 2002 response.  Sloca Decl., ¶ 7 & Exh. D.

of additional responsive documents to plaintiffs by letter dated January 8. Id., ¶ 6 &
Exh. E. This letter explained that material responsive to plaintiffs' request had been
enclosed, but that additional responsive records had been withheld on the basis of several
FOIA exemptions. Attached to this letter was a list describing the withheld documents by
category, specifying the number of pages in each category (totaling some 350 pages) and
the exemptions under which they had been withheld. Id., Exh. E at 8-9.

The January 8 letter also explained that one responsive document, a three-page
letter prepared by OGE, had been referred to OGE for a release decision, pursuant to the
Department's FOIA regulations. Sloca Decl., ¶ 6 & Exh. E at 2; see 43 C.F.R. § 2.15
(2002). The letter advised plaintiffs that OGE would contact them directly regarding the
release of this document. Id. This action completed the Department's response to
plaintiffs' September 25, 2002 FOIA request (although DOI recently released another 42
pages of responsive documents, by letter dated September 25, 2003, id., ¶ 9) .

By letter dated February 4, 2003, plaintiffs Defenders of Wildlife, and Friends of
the Earth, now joined by the Endangered Species Coalition, submitted an administrative
appeal from the Department's response. Sloca Decl., ¶ 7 & Exh. F. Plaintiffs argued
(1) that documents responsive to their request that they believed to be in the Department's
possession were neither released, nor included on the list of withheld documents, (2) that
the Department had not fully addressed portions of their request, and (3) that the FOIA
exemptions identified by the Department were not applicable to the withheld documents.

Id. In response to plaintiffs' appeal, a further search was conducted for responsive documents, in light of references in their letter to specific types of documents they were seeking, but no additional responsive records were located. Id., ¶ 8. By letter dated March 3, 2003, the Department advised plaintiffs that their appeal of the Department's withholdings was under review in the Office of the Solicitor, but that the appeal was in all other respects denied. Id., ¶ 8 and Exh. G. The Solicitor's Office had not yet responded to plaintiffs' appeal by the time they commenced this lawsuit.

In the meantime, by letter dated February 11, 2003, OGE informed Defenders of Wildlife and Friends of the Earth that it had decided to withhold the letter referred by DOI as exempt from disclosure under the FOIA. Declaration of Elaine Newton, dated September 25, 2003 ("Newton Decl."), ¶ 3 & Exh. A. Plaintiffs administratively appealed from this decision, stating that OGE had not adequately described the withheld document, nor justified the decision to withhold it. Id., ¶ 4 & Exh. B. OGE's General Counsel denied plaintiffs' appeal by letter dated April 14, 2003. Id., ¶ 4 & Exh. C.

**The FOIA Request to OGE**

On March 11, 2003, plaintiffs submitted a FOIA request to OGE (the "OGE Request"), incorporating by reference categories 2-5 of their September 25, 2002 request to DOI, which they attached. Newton Decl., ¶ 5 & Exh. D.[2] Based on the subject matter

---

[2]    The Department had already responded to the first category by producing the public disclosure reports filed by Mr. Griles, Mr. Cason, and Ms. Hopkins. Supra at 8.

of the request, OGE determined that responsive documents were most likely to be found in two offices, first, the Office of Agency Programs ("OAP"), responsible for maintaining files on public financial disclosure reports and related ethics-compliance matters; and, second, the Office of General Counsel and Legal Policy ("OGC"), which manages OGE's review and certification of public financial disclosure reports, and handles matters involving potential ethics rules violations.  Newton Decl., ¶¶ 8, 12.

OGE commenced the search by querying an automated file tracking system containing information on files maintained by OAP.  The search revealed a file folder of information on Mr. Griles, which was reviewed for responsive material.  Newton Decl., ¶¶ 11, 13.  OGE also searched an automated system that tracks files maintained by OGC, and which indicated that OGC's conflict-of-interest files contained responsive documents on Mr. Griles.  Id., ¶ 14.[3/]  In addition, OGE manually searched these files, and consulted with OGE staff currently working on matters regarding Mr. Griles.  Id., ¶¶ 14-15.

While processing the responsive documents located as a result of these inquiries, OGE continued to search for new or additional responsive documents in its automated file tracking systems; the files of the OGE General Counsel; the files of other OGE staff,

---

[3/]  OGE's searches of these automated file tracking systems revealed no documents concerning either Mr. Cason, or Ms. Hopkins.  This result was to be expected, inasmuch as OGE is only required by the Ethics in Government Act to review the reports filed by Presidential appointees requiring Senate confirmation, and certain other high-level appointees.  5 U.S.C. App. 4 § 106(a)(1); 5 C.F.R. § 2364.602(c)(1)(vi).  Neither Mr. Cason nor Ms. Hopkins is such an appointee.  Newton Decl., ¶ 16.

including members of OGC, who continued to work on matters pertaining to Mr. Griles; and duplicate filing systems (e.g., chronological files). Newton Decl., ¶¶ 17-18. After completing these searches, OGE determined which of the responsive documents to release, and which should be withheld, in some cases following consultation with DOI concerning documents that originated with that agency. OGE completed the processing of plaintiffs' FOIA request in early September 2003, and, by letter dated September 7, 2003, forwarded 73 pages of responsive material to plaintiffs, withholding approximately 60 pages on the grounds of FOIA Exemptions 2, 4, 5, 6 and 7. Id., ¶¶ 20-21 & Exh. E.

### Plaintiffs' Complaint

Plaintiffs filed their Complaint on June 3, 2003, "challenging [defendants'] failure . . . to fulfill the request of Plaintiffs for records related to the professional conduct and actions of senior officials at DOI . . . ." Complaint, ¶ 1. Claim One asserts that defendants have violated the FOIA by "failing to acknowledge or release [agreements] between Mr. Griles and his former firms that Plaintiffs specifically requested." Id., ¶ 62. Claim Two maintains that defendants "have failed to justify their use of FOIA exemptions to withhold records," id., ¶ 68, in particular, two pieces of correspondence between the Department and OGE, id., ¶¶ 64-65, and 109 pages, withheld by DOI, of "questions/responses regarding the financial holdings" of Mr. Griles, Mr. Cason and Ms. Hopkins. Id., ¶ 66. Plaintiff also allege that defendants have failed to disclose reasonably segregable, non-exempt portions of the withheld documents. Id., ¶ 67.

12

Claims Three and Four assert that defendants violated the FOIA by failing, respectively, "to provide a Vaughn index, or an equivalent thereof, for their withholdings," Complaint, ¶ 72, or "to respond to Plaintiffs' FOIA request and [appeal] within the statutory time period." Id., ¶ 78.  By way of relief, plaintiffs seek, inter alia, a declaration that defendants have violated the FOIA by failing to satisfy plaintiffs' requests for records, an order directing defendants to release all records responsive to plaintiffs' requests, and an award of their attorneys' fees and costs incurred in this action. Id. at 19 (prayer for relief).  As is shown below, however, defendants are entitled to summary judgment on Claims One and Two, while Claims Three and Four should also be dismissed, for failure to state claims upon which relief can be granted.

## ARGUMENT

## I. HAVING COMPLIED WITH THE FOIA, DEFENDANTS ARE BOTH ENTITLED TO SUMMARY JUDGMENT ON CLAIMS ONE AND TWO OF THE COMPLAINT.

Because the non-exempt documents responsive to both of plaintiffs' FOIA requests have been released, and because all of the documents or portions of documents that were not released have been appropriately withheld pursuant to FOIA Exemptions 2-7, defendants are entitled to summary judgment on Claims One and Two.

### A. Standards for Summary Judgment in FOIA Cases

Summary judgment is the procedural vehicle by which most FOIA actions are resolved. See, e.g., Misciavige v. IRS, 2 F.3d 366, 369 (11th Cir. 1993).  Summary

13

judgment is to be freely granted where, as here, there are no material facts genuinely at issue, and the agency is entitled to judgment as a matter of law.  See Alyeska Pipeline Serv. Co.v. EPA, 856 F.2d 309, 314-15 (D.C. Cir. 1988); Military Audit Project v. Casey, 656 F.2d 724,738 (D.C. Cir. 1981).

The FOIA requires agencies to release documents responsive to a request, except for those documents (or portions of documents) subject to one of nine statutory exemptions to the basic disclosure obligation.  5 U.S.C. §§ 552(a)(3), (b)(1)-(9).  In discharging its obligation, the agency must conduct a reasonable search for responsive documents, and, in withholding a document (or portions thereof) on the basis of one or more exemptions, must release those portions containing reasonably segregable, non-exempt material.  5 U.S.C. § 552(b) (text following exemptions).

A court reviews an agency's response to a FOIA request on a de novo basis.  See 5U.S.C. § 552(a)(4)(B).  The government bears the burden of justifying its withholdings under one or more of the FOIA's nine exemptions.  See McCutchen v. Dep't of Health & Human Servs., 30 F.3d 183, 185 (D.C. Cir.1994).  It may satisfy that burden through submission of an agency declaration, and, if necessary, a Vaughn index, describing the withheld material with reasonable specificity, explaining the reasons for non-disclosure, and demonstrating, again, with reasonable specificity, that reasonably segregable material has been released.  See Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 753 (1989); Armstrong v. EOP, 97 F.3d 575, 577-78 (D.C. Cir. 1996).

14

The agency can also show that it has discharged its obligation to conduct an

adequate search for records with affidavits "demonstrat[ing] that it has conducted a search

reasonably calculated to uncover all relevant documents." Weisberg v. Dep't of Justice,

745 F.2d 1476, 1485 (D.C. Cir. 1984). See Oglesby v. Dep't of the Army, 920 F.2d 57,

68 (D.C. Cir. 1990) (an agency is not required to search every record system, only to

show "that it made a good faith effort to conduct a search . . . using methods which can be

reasonably expected to produce the information requested"). To establish the sufficiency

of its search, the agency need only explain the "scope and method of the  search" in

"reasonable detail." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982).

### B.  Both DOI and OGE Conducted Reasonable Searches for Responsive Documents.

The searches conducted by DOI and OGE were reasonably calculated to locate

documents responsive to plaintiffs' requests. Weisberg, 745 F.2d at 1485. With respect

to the DOI Request, the Department first identified the offices -- the Secretary's

Immediate Office, and the Ethics Office -- that were likely sources of responsive material

given the subject matter of the request and its focus on the three named individuals.

Sloca Decl., ¶ 3, supra at 7. Once these offices were identified, they were both provided

copies of the DOI Request, and directed to search for responsive material. Id. The Ethics

Office searched its paper files on each of the named individuals for whom responsive

documents were sought, as well as its e-mail system and electronic records, and submitted

the responsive documents to the Department's FOIA Officer for processing. Id., ¶ 4.

15

Within the Secretary's Immediate Office, it was determined that the persons likely to maintain responsive documents were the three named individuals themselves -- Mr. Griles, Mr. Cason, and Ms. Hopkins. Each of these individuals was given a copy of the request, and asked to search his or her own files for responsive documents. Through subsequent consultation with them, the Department determined that they had no additional responsive material beyond that already gathered by the Ethics Office itself. Sloca Decl., ¶¶ 3-4. As discussed above, the responsive documents were processed by the Department, and responsive, non-exempt records (or reasonably segregable portions thereof) were released to plaintiffs Defenders of Wildlife and Friends of the Earth on December 6, 2002, and January 3 and 8, 2003. Id., ¶¶ 5-6 & Exhs. C-E. A second search, moreover, was conducted in connection with plaintiffs' administrative appeal. Id., ¶ 8. By forwarding the DOI Request to the offices likely to posses responsive records, and directing them to search for responsive records, the Department fully discharged its obligation to search for documents under the FOIA.

Likewise, OGE conducted a reasonable search for records responsive to the OGE Request. It identified the constituent offices that were likely to possess the kind of documents described in plaintiffs' request, and repeated searches were performed of the automated databases that track the files maintained by these offices. The ethics compliance and conflict-of-interest files identified in these databases as pertaining to Mr. Griles were manually reviewed for responsive material. In addition, OGE conducted a

16

manual search of OGC's conflict-of-interest files generally, searched duplicate filing systems (e.g., "chron" files), and searched for responsive documents in the files of OGE staff currently working on matters pertaining to Mr. Griles, including the General Counsel. See Newton Decl., ¶¶ 9-18, supra at 10-12. By searching the individual files and filing systems most likely to contain records responsive to plaintiffs' request, OGE also discharged its search obligation under the FOIA.

    **C.**    **DOI and OGE Properly Withheld Workpapers Generated During the Preparation and Review of Public Financial Disclosure Reports.**

    (DOI Vaughn Nos. 1-4, 7-16, 31, 33, 34, and 53); (OGE Vaughn Nos. 8, 14, and 15); (Exemptions 2, 4, 5, 6)

Among the documents withheld by both the Department and OGE were workpapers generated during the preparation, review and certification of various public financial disclosure reports filed by Mr. Griles, Mr. Cason, and Ms. Hopkins (hereinafter, "278 workpapers"). These documents include charts, spreadsheets and other working papers created by DOI and OGE staff reviewing the draft reports submitted by these three individuals, as well as communications within and between the agencies, and with the individuals themselves.

Generally speaking, the documents in this category list assets, liabilities, gifts or transactions reported (or previously reported) by these officials, with questions by agency staff about the items listed, such as the value, associated income, or disposition of particular holdings, comments regarding potential conflicts raised by reported matters,

17

and requests for the additional information needed to resolve these issues. In some cases, the documents include handwritten notations by reviewers, or the filing individuals, or other communications providing the answers or additional information sought. Also included are draft reports (and related communications) identifying financial matters to be disclosed, along with the reviewers' notations showing questions to be answered, information to be supplied, and changes to be made before the drafts are finalized. See Index Submitted by the Department of the Interior, Simmons Decl. Exh. A ("DOI Vaughn"), Nos. 1-4, 7-16, 31, 33, 34, 53; Index of Records Responsive to March 11, 2003 FOIA Request, Rick Decl., Exh. A ("OGE Vaughn"), Nos. 8, 14, 15.

These records document the consultative process within and between OGE and DOI, and with the three individuals, that was meant to ensure, first, that their public financial disclosure reports are complete and accurate, containing all the information called for under the Ethics Act; and, second, to identify (and resolve, if necessary) any real or apparent conflicts of interest, or other violations of ethics laws and regulations, revealed by the information disclosed. Simmons Decl., ¶¶ 3, 11; Rick Decl., ¶¶ 6, 30-31; see supra at 4, 5-6. For a number of reasons, defendants acted in accordance with the FOIA, when they refused to release these materials in response to plaintiffs' requests.

1.    **The 278 workpapers are deliberative material that is excepted from disclosure by FOIA Exemption 5.**

FOIA Exemption 5, 5 U.S.C. § 552(b)(5), provides that the FOIA's disclosure obligations do not apply to "inter-agency or intra-agency memorandums or letters which

18

would not be available by law to a party . . . in litigation with the agency." Exemption 5 thus creates an exception to mandatory disclosure "for documents that are normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); Martin v. Office of Special Counsel, 829 F.2d 1181, 1184 (D.C. Cir. 1987).

One of the principal privileges incorporated by Exemption 5 is the deliberative process privilege, see Sears, 421 U.S. at 149-51, the general purpose of which is to "prevent injury to the quality of agency decisions" by protecting the "decision making processes of government agencies." Id. at 150-51. The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001).

To fall within Exemption 5's exception for documents protected by the deliberative process privilege, the documents must be both "pre-decisional" and "deliberative." Mapother v. Dep't of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993).[4] The

---

[4] The documents must also satisfy the exemption's threshold requirement that they be "inter-agency or intra-agency" memoranda, 5 U.S.C. § 552(b)(5). The 278 workpapers described in defendants' Vaughn indices include various internally generated workpapers, drafts, and other intra- and inter-agency communications that easily meet this test. The remaining communications between the Department and the filing individuals (or their representatives), seeking and exchanging information needed to complete the review and certification of their SF 278s, and resolve any attendant conflicts or ethics

278 workpapers are pre-decisional because they antedate and were "prepared in order to assist [DOI and OGE] in arriving at . . . decision[s]," Quarles v. Dep't of the Navy, 893 F.2d 390, 392 (D.C. Cir. 1990); see also Mapother, 3 F.3d at 1537, concerning the accuracy and completeness of the filers' SF 278s, and the determination and resolution of any conflicts or other ethics issues raised by the matters reported. Simmons Decl., ¶¶ 3, 11; Rick Decl., ¶¶ 6, 30-31.

The workpapers are also deliberative. Documents are deliberative if they "reflect the give-and-take of the consultative process," Access Reports v. Dep't of Justice, 926 F.2d 192, 195 (D.C. Cir. 1991), citing Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980); see Sears, 421 U.S. at 150 (documents "reflecting . . . deliberations comprising part of a process by which governmental decisions . . . are formulated" are deliberative), and their disclosure "would expose an agency's decision making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." Formaldehyde Inst. v.

---

issues, also constitute "intra-agency memorandums" within the meaning of Exemption 5, which courts have held to include communications made between an agency and outside consultants to assist the agency in its decision making. Pub. Citizen, Inc. v. Dep't of Justice, 111 F.3d 168, 170 (D.C. Cir. 1997). In Klamath, the Supreme Court recently held that communications with outside consultants who are acting as self-advocates "at the expense of others seeking [government] benefits inadequate to satisfy everyone" do not qualify as intra-agency communications, 532 U.S. at 12, but, at the same time, the Court declined to overrule Public Citizen and other precedents that have considered consultant communications to be "intra-agency" under circumstances different than those presented in Klamath itself. Id. at 12 n. 4.

Dep't of Health and Human Serv., 889 F.2d 1118, 1122 (D.C. Cir. 1989).  That is the

case here with the 278 workpapers.

As explained by the Deputy General Counsel of OGE, and DOI's Designated

Agency Ethics Official, documents of this nature must be safeguarded from disclosure to

protect and promote the quality of decision making throughout the Executive Branch

when agencies seek both to ensure that senior officials have fully complied with the

requirements of public disclosure, and to identify and resolve real, potential or apparent

conflicts of interest that may exist between officials' own financial interests and their

obligations as public servants.  Rick Decl., ¶¶ 10-15, 28-31; Simmons Decl., ¶¶6-11.  To

ensure that the reports filed by senior Executive Branch officials and nominees meet all

legal disclosure requirements, and to appropriately resolve any questions concerning

conflicts of interest, or other ethics issues, on the basis of these reports, agency ethics

officials must engage in a process of extensive and detailed consultation with filing

officials and nominees concerning their assets, income, liabilities, business affiliations,

and other financial interests.  This consultation process is necessarily probing because the

EIGA requires both extensive disclosures of quantitative financial data as well as

disclosures of information that is more qualitative in nature.  Simmons Decl., ¶¶ 4, 6;

Rick Decl., ¶¶ 10-11.[5/]  These consultations with individual filers, and the information

---

[5/]  For example, the statute requires filing officials to report their "sources" of
income, "identify" their property interests, and provide "descriptions" of transactions and
agreements.  5 U.S.C. App. 4 § 102(a); see Simmons Decl., ¶ 6; Rick Decl., ¶ 10.

21

gleaned, must necessarily be documented so that agency officials can be certain they have sought and received and accurately reflected on a filer's report the information needed, and that nothing has been misreported, overlooked, or, for that matter, "over" reported. This documentation can also be important to the preparation of ensuing years' reports. Rick Decl., ¶ 13; Simmons Decl., ¶¶ 7-8.

This documentation, such as the 278 workpapers withheld here, not only reflects the consultative process among the agency, OGE and filing officials and nominees, it also reflects ethics officials' thoughts and opinions concerning what must be reported, and how, what conflicts of interest or other ethics issues may lurk behind the matters reported, and what additional information would be material to their proper resolution. In addition, these papers also frequently include information, in excess of that which the EIGA requires, that individual filers voluntarily provide at the agency's request, or at their own initiative, that is often needed as a practical matter to evaluate whether the information contained on the report itself is complete, to identify potential conflicts or other ethical issues, and to resolve them appropriately. Rick Decl., ¶¶ 12-13; Simmons Decl., ¶¶ 8, 10.

Disclosure of 278 workpapers would expose the review and certification process in such a way as to "discourage candid discussion" within federal agencies and impair their ability to achieve the statutory purposes of public financial disclosure, and preventing conflicts of interest before they arise. Formaldehyde Institute, 889 F.2d at 1122. See S. Rep. No. 95-170 at 21-22, supra at 4. An agency's ethics staff may fear that

22

public disclosure of their workpapers -- which document, directly or indirectly, their consultations with political officials or nominees at the highest levels of the agency, and which reflect their deliberations on what matters must be reported, and ethics issues they may raise -- will lead to second-guessing and criticisms of decisions not to list certain items on a senior nominee's or official's report, or of their evaluation and resolution of that individual's potential conflicts.  Staff may refrain, therefore, from documenting, or even exploring, the details of high-level nominees' and officials' financial interests as thoroughly as they otherwise would do.  Simmons Decl., ¶ 9; Rick Decl., ¶ 14.

Filing officials and nominees, for their part, may become increasingly reluctant to volunteer the information they are *not* required by the Act to report, but which agencies nevertheless depend on both to make sure that filers have reported all the information that *is* required, and to evaluate potential conflicts.  See, e.g., Simmons Decl., ¶ 10 (discussing, inter alia, brokerage statements supplied by Mr. Griles); Rick Decl., ¶ 15.  In either case, the quantity and quality of information available to agencies to ensure the completeness of public disclosure and the proper identification and resolution of conflicts will be diminished, to the detriment of an agency's, and OGE's decision making on these important matters.  See Sears, 421 U.S. at 151 ("[t]he quality of a particular agency decision will clearly be affected by the communications received by the decision maker . . . prior to the time the decision is made").  The 278 workpapers withheld by defendants are thus the sort of deliberative material "which must remain uninhibited and thus

23

undisclosed, in order to supply maximum assistance to the [agency] in reaching its

decision." Negotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 186 (1975).

It does not matter that much of the information contained in the workpapers could

be described, on its face, as factual. "The deliberative character of agency documents can

often be determined through the simple test that factual material must be disclosed but

advice and recommendations may be withheld." Mapother, 3 F.3d at 1537. That rule of

thumb, however, "is not infallible and must not be mechanically applied," because "the

privilege serves to protect the deliberative process itself, not merely documents

containing deliberative material." Id. "The key question in identifying deliberative

material," therefore, "is whether disclosure of the information would discourage candid

discussion within the agency." Access Reports, 926 F.2d at 1195. Where that would be

the case, as here, courts have held documents to be exempt from disclosure under the

FOIA "[e]ven where the requested material is found to be factual," Quarles, 893 F.2d at

392. Accordingly, defendants appropriately withheld the 278 workpapers that fall within

the scope of plaintiffs' FOIA requests, under authority of Exemption 5.[6]

---

[6] The documents were also appropriately withheld under Exemption 4. 5 U.S.C.
§ 552(b)(4). This exemption applies by its terms, inter alia, to "commercial or financial
information obtained from a person" that is "confidential," and has been held to
encompass -- under the "third prong," so-called, of Nat'l Parks & Conservation Ass'n v.
Morton, 498 F.2d 765, 770 n. 17 (D.C. Cir. 1974) -- information the disclosure of which
would cause "an impairment of an agency's ability to carry out its statutory purpose . . .."
Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 30 (D.D.C. 2000).
Because disclosure of 278 workpapers would deter filing officials and nominees from
voluntarily submitting information that the EIGA does not require -- but which agencies

24

## 2.   The 278 workpapers are also subject to withholding under Exemption 6.

The 278 workpapers also fall within the ambit of Exemption 6, because their

disclosure "would constitute a clearly unwarranted invasion of personal privacy."

5 U.S.C. § 552(b)(6).[2/]  In applying Exemption 6, a court

> must identify the privacy interest served by withholding information and
> then the public interest that would be advanced by disclosing it.  Having
> done so, the court must determine whether, on balance, disclosure would
> work a clearly unwarranted invasion of personal privacy.

Painting and Drywall Work Preservation Fund, Inc. v. Dept. of Housing and Urban Dev.,

936 F.2d 1300, 1302 (D.C. Cir. 1991).  Privacy encompasses the "'individual's control of

information concerning his or her person,'" including  "the prosaic (e.g., place of birth

and date of marriage) as well as the intimate and potentially embarrassing."  Id., quoting

Reporters Committee, 489 U.S. at 763.  The "only relevant public interest to be weighed

in this balance is the extent to which disclosure would serve the core purpose of FOIA,

which is contribut[ing] significantly to public understanding of the operations or activities

of the government."  Dep't of Defense v. FLRA, 510 U.S. 487, 495-96 (1994).

---

nevertheless depend upon to assure that public disclosure is complete, and ethics issues
are properly resolved -- these documents are also protected from disclosure by
Exemption 4, to avoid "impairment of [agencies'] ability to carry out [the] statutory
purpose[s]" of the EIGA.  Id.

[2/] The 278 workpapers easily meet the exemption's threshold requirement that
the documents in question constitute "personnel, medical or similar files," 5 U.S.C.
§ 552(b)(6), because all of the information contained therein "applies to particular
individuals."  Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982).

The 278 workpapers include draft SF 278s, and other spreadsheets, charts, and communications containing private financial information of an extensive and highly particularized nature, such as the type and value of the three individuals' assets and property interests, the sources and amount of their outside income, and the nature and amount of their personal debts.  See, e.g., DOI Vaughn Nos. 2-4, 7, 8, 11, 12, 16, 53; OGE Vaughn Nos. 8, 15.  The substantial privacy interest of individuals in such discussions of their financial circumstances has been repeatedly recognized.  See Common Cause v. Nuclear Regulatory Comm'n, 674 F.2d 921, 938 (D.C. Cir. 1982); Hill v. Dep't of Agriculture, 77 F. Supp. 2d 6, 7 (D.D.C. 1999).  See also Physicians Comm. for Responsible Medicine v. Glickman, 117 F. Supp. 2d 1, 5 (D.D.C. 2000).

To the extent, on the one hand, that these documents contain information *in excess* of what the Ethics Act requires filing individuals to disclose, information that was voluntarily provided by the three filing individuals during the course of the review and certification process, see Rick Decl., ¶ 12; Simmons Decl., ¶ 10, then disclosure would constitute a clearly unwarranted invasion of their privacy.  There is no countervailing public interest in whatever light this information might shine on "the operations or activities of the government."  Reporters Committee, 489 U.S. at 773.  Congress already so determined when it placed limits on required public disclosure in the EIGA, 5 U.S.C. App. 4 § 102.  See Simmons Decl., ¶ 5.[8/]  Even if Congress had not already determined

---

[8/]   See 5 C.F.R. § 2634.104(c) ("Financial disclosure reports are not net worth

26

that individual financial privacy outweighs the public interest in disclosure of information

beyond what the Ethics Act requires, revealing additional financial data on this handful of

agency employees would not shed enough light on "what the Government is up to" to

justify disclosure. Oguaju v. United States, 288 F.2d 448, 451 (D.C. Cir. 2002).

The same holds true even to the extent the 278 workpapers contain financial

information that the individual filers have, in fact, publicly reported on their SF 278s.

Although the EIGA requires agencies to make copies of individuals' public financial

disclosure reports available to members of the public upon request, 5 U.S.C. App. 4

§ 105(a), (b)(1), Congress has also recognized the potential for misuse of this highly

personal information, and so the Ethics Act generally forbids the use of "a report" for

commercial purposes; for use, directly or indirectly, in the solicitation of money for any

political, charitable or other purpose; or for determining or establishing the credit rating

of any individual. Id., § 105(c)(1). The protection afforded to filers by the statute is

limited by its terms, however, to the "report" itself. If the same information could be

obtained through a FOIA request for the underlying workpapers, the recipient (and the

public) could put this detailed financial information to uses that are forbidden of the

report itself under the EIGA. Simmons Decl., ¶¶ 13-14; Rick Decl., ¶ 33.

---

statements. [They] seek only the information that the President, Congress or OGE . . . has
deemed relevant to the administration of [the ethics laws].").

27

The resulting loss of the filer's "control of information concerning his or her person," Reporters Committee, 489 U.S. at 763, and invitation to "unwarranted intrusions," Nat'l Ass'n of Retired Fed. Employees v. Horner, 879 F.2d 873, 878 (D.C. Cir. 1989) ("NARFE"), constitute a substantial invasions of personal privacy against which there is, again, no countervailing public interest.  The public interest in financial data that senior Executive Branch officials have reported on their SF 278s is already satisfied by the public access provisions of the Ethics Act.  It does not serve the public interest to any greater extent whatsoever to obtain workpapers containing the same information through the mechanism of the FOIA.  See Hopkins v. HUD, 929 F.2d 81, 88 (2d Cir. 1991) ("The simple invocation of a legitimate public interest . . . cannot itself justify the release of personal information.  Rather, a court must first ascertain whether that interest would be served by disclosure."); Halloran v. Veterans Admin., 874 F.2d 315, 323 (5th Cir. 1989).  Given the absence of any public interest in the disclosure of the 278 workpapers, it is clear this information was appropriately withheld under Exemption 6, for "even a modest privacy interest outweighs nothing every time." NARFE, 879 F.2d at 879.[2/]

_____

[2/]  To the extent the 278 workpapers contain information that is also reported in the filing individuals' SF 278s, then they are also subject to withholding under the "High 2" exemption of 5 U.S.C. § 552(b)(2).  Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992).  First, as documents prepared and used for predominantly internal purposes by agency staff reviewing individual filers' reports, they qualify as records "related solely to the internal personnel rules and practices of an agency," as Exemption 2 requires.  Id. Second, as discussed above, disclosure of workpapers containing the same information

### D.   DOI and OGE Properly Withheld Drafts and Other Memoranda Related to Mr. Griles' Ethics Agreement.

(DOI <u>Vaughn</u> Nos. 6, 17, 19-28, 45, 55); (OGE <u>Vaughn</u> Nos. 1-7); (Exemption 5)

In April 2001, prior to his confirmation, Mr. Griles entered into an ethics agreement with DOI, <u>see</u> 5 C.F.R. § 2634.801, <u>supra</u> at 6, in which he agreed to several undertakings to avoid any actual or apparent conflicts of interest in the event he were confirmed as Deputy Secretary of the Interior.  <u>See</u> Complaint, ¶ 30.  In accordance with the terms of his ethics agreement, he has since executed various statements of disqualification (recusals) from matters involving former employers and clients, and, to avoid even the appearance of a conflict, from matters pertaining to environmental review of coalbed methane mining in Wyoming's Powder River Basin.  <u>See id.</u>, ¶¶ 36-39.

In responding to plaintiffs' FOIA requests, defendants withheld drafts of these documents (the final versions have been released), and in addition withheld related inter- and intra-agency memoranda.  Specifically, defendants withheld drafts of Mr. Griles' ethics agreement (DOI <u>Vaughn</u> Nos. 17, 19; OGE <u>Vaughn</u> Nos. 1-5); various internal agency memoranda discussing the terms of, and changes to, the draft ethics agreement (DOI <u>Vaughn</u> No. 6; OGE <u>Vaughn</u> Nos. 3-7); drafts of the recusals Mr. Griles has

---

reported in an SF 278 would allow recipients to evade the limitations that the EIGA places on the use of those reports, for the protection of filers' privacy.  5 U.S.C. App. 4 § 105(c)(1).  Where disclosure presents a risk that statutory requirements may be circumvented, the documents in question may be withheld under Exemption 2.  <u>Id</u>.

executed (DOI <u>Vaughn</u> Nos. 20, 21, 23); and drafts of various certifications to the Senate, and OGE, that Mr. Griles has complied with and will abide by his obligations under the ethics laws. (DOI <u>Vaughn</u> Nos. 22, 24-27). <u>See</u> Simmons Decl., ¶ 19; Rick Decl., ¶ 24. These withholdings were proper under FOIA Exemption 5, because these documents are protected from disclosure by the deliberative process privilege.

The preparation of an ethics agreement with a high-level nominee is a deliberative process involving a number of decisions to be made between OGE and the agency, with the involvement of the individual nominee. If the agency and OGE have determined that a potential conflict exists between the nominee's financial interests and the duties of the office to which he or she has been nominated, then they must assess and agree on the steps the nominee must take to ensure that no violation of the conflict-of-interest or other ethics rules occurs. Which of several remedial steps to require, whether divestiture, recusal, or a general limitation of duties, is an exercise in judgment that must take into account what safeguards are necessary to address the ethical problems presented, the agency's interest in the capacity of a senior official to carry out the responsibilities of his or her office, and accommodation of the legitimate personal and financial interests of the nominee and his or her family. Rick Decl., ¶¶ 16-18; Simmons Decl., ¶¶ 17-19.

In any given case, striking the proper balance between these competing considerations depends upon a frank exchange of ideas and opinions among OGE, the agency, and the nominee, centered around successive drafts of an ethics agreement

circulated among all those concerned. The drafts, and the comments thereon, reflect

proposals by the agency, OGE, or even the nominee, which may be amended, rejected, or

later reinstated as one draft after another is reviewed at various levels within OGE and/or

the agency, and as the agencies' views or understanding of the issues may change. Rick

Decl., ¶¶ 16-20; Simmons Decl., ¶¶ 17-18. Similarly, drafts of related instruments such

as statements of disqualification and of resignation from former employment (DOI

Vaughn Nos. 6, 20, 21, 23), and draft certifications of compliance with ethics laws to be

made to official bodies such as the U.S. Senate, or OGE (DOI Vaughn Nos. 22, 24-27)

reflect internal agency deliberations and the views of agency staff on what actions are

necessary and appropriate for a nominee such as Mr. Griles to take in order to resolve

potential conflicts between his financial interests and the duties of his office, and to

certify his compliance with applicable ethics requirements. Simmons Decl., ¶ 19.

As drafts, these documents are exempt from withholding, for "[d]raft documents

by their very nature, are typically predecisional and deliberative." Exxon Corp. v. Dep' t

of Energy, 585 F. Supp. 690, 697 (D.D.C. 1983). See also Dudman Communications

Corp. v. Dep't of the Air Force, 815 F.2d 1565, 1568-69 (D.C. Cir. 1987); City of Va.

Beach v. Dep't of Commerce, 995 F.2d 1247, 1253 (4th Cir. 1993). This is so, because

the process by which a draft evolves into the final version of a document is inherently

deliberative. See, e.g., Dudman, 815F.2d at 1569. A fortiori, the comments and

suggestions on these drafts, including handwritten notations, are also predecisional and

deliberative as they reflect the personal opinions of agency employees on how the draft

can be improved.  See, e.g., City of Virginia Beach, 995 F.2d at 1253, citing Coastal

States, 617 F.2d at 866.  See also Judicial Watch of Florida, Inc. v. Dep't of Justice, 102

F. Supp.2d 6, 12-15 & n.7 (D.D.C. 2000).  Public disclosure of these documents would

chill, and thus diminish the quality of internal deliberations as the agency and OGE

attempt to evaluate possible conflicts of interest and the ramifications for the agency, and

the individual official or nominee, of possible remedial actions that might be taken.  Rick

Decl., ¶¶ 20, 26; Simmons Decl., ¶ 18.  The draft ethics agreements, recusals, and

certifications, as well as notations and separate memoranda commenting thereon, are thus

all predecisional and deliberative, and therefore exempt from disclosure.[10]

> ### E.   Defendants Acted in Accordance With the FOIA When They Refused To Release Their Inter-Agency Deliberations Concerning Mr. Griles' Compliance With the Ethics Laws.
>
> (DOI Vaughn Nos. 36-43, 46-52); (OGE Vaughn Nos. 9-12); (Exemption 5)

On May 25, 2002, the *Washington Post* published an article, "Interior Official's

Memo Raises Conflict Issue," speculating that Mr. Griles may violated his recusal

---

[10] DOI also withheld (i) a draft memorandum of advice to Mr. Griles concerning whether and under what circumstances Mr. Griles could participate in a meeting with representatives of Sinclair, Inc.; and (ii) a second memorandum of advice (and a related memorandum to the file) regarding whether Mr. Griles should recuse himself from participation in matters related to Cobell v. Norton, No. 96-1285 (RCL) (D.D.C.). Because of the pre-decisional and deliberative nature of these documents, DOI properly declined to release them.  DOI Vaughn Nos. 28, 45, 55; Simmons Decl., ¶¶ 21-22.

agreements by writing a letter to the EPA concerning environmental review of coal-bed

methane mining in Wyoming. This article prompted OGE to write a June 20, 2002 letter

to the DOI Ethics Office (DOI Vaughn No. 43, OGE Vaughn No. 9), requesting DOI's

assessment of whether Mr. Griles in fact violated any conflict of interest law, regulations

regarding impartiality, or his ethics agreement. Simmons Decl., ¶ 23; Declaration of

Marilyn L. Glynn, dated September 25, 2003 ("Glynn Decl.") (filed herewith), ¶ 14.

Following a review of the matter, DOI sent a letter to OGE, on September 10, 2002 (DOI

Vaughn No. 47; OGE Vaughn No. 10), providing an analysis by the DOI Ethics Office as

to whether Mr. Griles violated any of his ethics obligations. Simmons Decl., ¶ 23. On

November 29, 2002, DOI again wrote to OGE, responding to OGE's request for

additional information and analysis of the matter (OGE Vaughn No. 11). OGE wrote

again to DOI on December 20, 2002, discussing issues that remained to be resolved and

requesting DOI to make further inquiries (OGE Vaughn No. 12).  Glynn Decl., ¶ 14.

Even though no decision has been reached on this matter, this inter-agency

correspondence was properly withheld, as an exchange of information, opinions and

analysis between two federal agencies that are responsible for ascertaining whether Mr.

Griles has complied with applicable ethics laws and regulations, and his ethics agreement,

and for deciding what corrective action to take in the event it is determined that he has

not. See 5 U.S.C. App. 4 § 402(b)(9), (f)(2); 5 C.F.R. § 2638.203(a)(9); Simmons Decl.,

¶ 23; Glynn Decl., ¶¶ 8-12, 15-16. This correspondence is pre-decisional, inasmuch as it

was prepared to assist in arriving at that as yet unmade decision, Formaldehyde Institute, 889 F.2d at 1122, and it is deliberative, reflecting "the give-and-take of the consultative process" between the two agencies.  Access Reports, 926 F.2d at 1195.  Congress expressly included "inter-agency" memoranda such as these within the scope of Exemption 5 to permit one agency to obtain written recommendations and advice from another agency, without requiring that the advice be any more disclosable than advice received from within the agency itself.  Grumman Aircraft, 421 U.S. at 187-88.

Releasing this correspondence would be harmful, moreover, to the deliberative process by which OGE reviews matters of ethics compliance.  Mapother, 3 F.3d at 1537. OGE depends greatly on individual agencies as the best situated to conduct necessary inquiries when questions arise concerning the conduct of their senior officials, and must also depend on them, therefore, to be absolutely candid when reporting facts and presenting their views about such matters.  Disclosure of such communications would have a serious chilling effect on agencies' willingness to speak freely about these sensitive issues.  OGE would be deprived, then, of the best information available with which to determine the existence (and proper resolution) of conflicts of interest, and other potential violations of the ethics laws, Glynn Decl., ¶¶ 8-12, 15-16, thus "undermin[ing] [its] ability to perform its functions."  Formaldehyde Institute, 889 F.2d at 1122.

For the same reasons, DOI was justified in withholding drafts of its September 10, 2002 response to OGE's initial June 20, 2002 inquiry (DOI Vaughn Nos. 48-52).  These

34

drafts, together with the separate written comments of those who reviewed the drafts, reflect DOI's internal deliberations concerning both Mr. Griles' compliance with his ethics obligations, and how to respond to OGE on that issue. Simmons Decl., ¶ 24. Dudman, 815 F.2d at 1568-69; see City of Virginia Beach, 995 F.2d at 1253. Releasing these documents would inhibit frank internal debate and exploration of these sensitive matters, especially where the conduct of high-level agency officials is concerned. Simmons Decl., ¶ 24. Sears, 421 U.S. at 150; Grumman Aircraft, 421 U.S. at 186.[11/]

**F.      DOI Properly Withheld Confidential Financial
         Disclosure Reports That the Ethics in Government
         Act Prohibits Agencies from Releasing.**

(DOI Vaughn Nos. 32, 35) (Exemptions 3 and 6)

The EIGA permits agencies to require public officials who must file public disclosure reports, under 5 U.S.C. App. 4 § 101, to file *confidential* financial disclosure reports containing information that is more extensive than that which must be reported for

---

[11/] Also properly withheld were drafts of several agency memoranda, prompted by press reports concerning Mr. Griles, explaining the Ethics Office's findings on the matters raised by OGE; discussing the establishment of additional management controls to ensure compliance with recusals; and proposing procedures for responding to press inquiries about particular ethics matters. Simmons Decl, ¶ 25; DOI Vaughn Nos. 36-40, 42. Although none of these memos wase finalized, they played a role in a "process of examining [agency] policies," even though that process "d[id] not ripen into agency decisions." Sears, 421 U.S. at 151 n. 8; Hamilton Sec. Group v. HUD, 108 F. Supp. 2d 23, 30 (D.D.C. 2000). See also Krikorian v. Dep't of State, 984 F.2d 461, 466 (D.C. Cir. 1993) (the withheld document "includes two draft letters proposing two options for replies to public inquiries . . . Neither option was ultimately used by the Department but the letters reflect advisory opinions that are important to the deliberative process").

purposes of public disclosure on a form SF 278. 5 U.S.C. App. 4 § 107(a)(1). Pursuant to this authority, the Department requires certain high-level officials to file forms DI-278, "Confidential Supplement to the Financial Disclosure Report SF-278." Simmons Decl., ¶ 29. The EIGA expressly provides, however, that the information agencies require in a supplemental report of this kind "shall be confidential and shall not be disclosed to the public." Id., § 107(a)(2). In responding to plaintiffs' FOIA request, the Department refused to release confidential supplemental reports completed by Mr. Cason, and Ms. Hopkins. See Simmons Decl., ¶ 29; DOI Vaughn Nos. 32, 25.

These withholdings were proper under FOIA Exemption 3. Exemption 3 permits the withholding of information that another statute prohibits an agency to disclose, so long as the statute either "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Section 107(a)(2) of the EIGA qualifies as an Exemption 3 statute under both of these criteria. By specifying in no uncertain terms that information contained in a confidential financial disclosure report "shall not be disclosed to the public," § 107(a)(2) leaves agencies "no discretion on the issue." Baldridge v. Shapiro, 455 U.S. 345, 355 (1982). Equally so, § 107(a)(2) qualifies as an Exemption 3 statute by "refer[ring] to particular types of matters to be withheld," that is to say, the personal financial information that an agency requires an employee to disclose in a confidential report under

36

authority of § 107(a)(1).  Mudge Rose Guthrie Alexander & Ferdon v. ITC, 846 F.2d

1527, 1530 (D.C. Cir. 1988).  Because the confidential financial disclosure reports that

Mr. Cason and Ms. Hopkins were required to file under authority of § 107(a)(1) therefore

fall within the scope of § 107(a)(2)'s prohibition on disclosure, they were properly

withheld when the Department responded to plaintiffs' FOIA request.[12]

### G.    The Department Appropriately Withheld Confidential Commercial Information Voluntarily Provided to DOI by Mr. Griles' Former Employer.

(DOI Vaughn Nos. 5, 29, 30, 44) (Exemptions 4 and 6)

DOI also withheld drafts (or portions of drafts) of Mr. Griles' separation

agreement with his prior firm, National Environmental Strategies, Inc. ("NES"), and an

October 2002 copy of NES's client list.  Prior to becoming Deputy Secretary of the

Interior, Mr. Griles was a partner in NES, and at the time of his nomination began to

negotiate the terms of his separation from the company.  NES provided the Department

with a copy of the draft separation agreement to review for purposes of preparing the

terms of Mr. Griles' ethics agreement.  Simmons Decl., ¶ 27; Declaration of Marc

---

[12] Even if § 107(a)(2) were not an Exemption 3 statute, withholding these reports
was appropriate because they are also excepted from disclosure by Exemption 6, under
the same analysis set forth supra, at 26-27.  These reports apply to particular individuals,
and contain personal financial information in which these individuals have a substantial
privacy interest.  There is, on the other hand, no countervailing public interest in the
disclosure of this information, since they reveal little to nothing about the "operations or
activities" of the government, Reporters Committee, 489 U.S. at 773, a conclusion
buttressed by Congress's decision to prohibit disclosure of this information to the public.
5 U.S.C. App. 4 § 107(a)(2).

Himmelstein, dated September 16, 2003 ("Himmelstein Decl."), ¶ 2.  In the fall of 2002,

DOI requested a copy of NES's client list for purposes of preparing its response to OGE's

inquiries about Mr. Griles' communications with the EPA, supra at 33-34.  Simmons

Decl., ¶ 28; Himmelstein Decl., ¶ 5.

      The decision not to release these documents was proper under Exemption 4 of the

FOIA.  Exemption 4 protects "trade secrets and commercial or financial information

obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4).  The

documents in question, a severance agreement with one of NES's principals, and a list of

the company's clients, indisputably qualify as "commercial or financial" information, as

they relate to business or trade.  See, e.g., Allnet Communications Servs. v. FCC, 800 F.

Supp. 984, 988 (D.D.C. 1992).  As information provided to the government by a

corporate entity, they also qualify as "information obtained from a person."  Id.

      They also meet the requirement that the withheld information be confidential.

Where commercial information is submitted voluntarily to an agency, it is considered

confidential, for purposes of Exemption 4, "if it is of a kind that would customarily not be

released to the public by the person from whom it was obtained."  Critical Mass Energy

Project v. NRC, 975 F.2d 871, 878 (D.C. Cir. 1992) (en banc).  As the record reflects,

NES voluntarily provided the Department both the draft of its severance agreement with

Mr. Griles, and its October 2002 client list, to assist DOI in the process of Mr. Griles'

confirmation, and in assuring his subsequent compliance with the ethics laws.

Himmelstein, ¶ 7; Simmons Decl., ¶¶ 27-28. DOI had no "actual legal authority" to

compel NES (or Mr. Griles) to submit the draft agreement or the client list for DOI's

review. Center for Auto Safety v. NHTSA, 244 F.3d 144, 149 (D.C. Cir. 2001). At most

DOI had authority under the EIGA to compel Mr. Griles to disclose a "description" of the

agreement's terms. 5 U.S.C. App. 4 § 102(a)(7); see Simmons Decl., ¶ 5.[13] Nor was

NES required to submit the draft agreement or its client list to realize the benefits of a

voluntary government program, to obtain a government approval of some kind, or

otherwise to do business with the federal government. See, e.g., Pub. Citizen Health

Research Group. v. FDA, 997 F. Supp. 56, 61 & n. 3 (D.D.C. 1998).

NES also considers the severance agreement and its client list to be proprietary

information, Himmelstein Decl., ¶ 36, that it does not "customarily" release to the public.

Critical Mass, 975 F.2d at 878. In fact, NES has never disclosed separation agreements

with its principals to the public, nor its client list, and it made these documents available

to DOI only after requesting and obtaining express assurances of confidentiality. Id.,

¶¶ 3-6. Accordingly, these documents are also "confidential" within the meaning of

Exemption 4, and were properly withheld.

---

[13] The severance agreement is thus also subject to withholding under
Exemption 6, because it contains information that Mr. Griles is not required by law to
disclose. Its release would result in an unwarranted invasion of his personal privacy, for
the reasons stated supra, at 26-27.

**H.    OGE Complied With the FOIA When It Withheld
        <u>Records Compiled for Law Enforcement Purposes.</u>**

(OGE <u>Vaughn</u> No. 13) (Exemptions 5, 7(A), 7(C))

Among the documents that OGE did not make available when responding to

plaintiffs' FOIA request is an investigative timeline prepared by the Department of the

Interior Office of the Inspector General ("OIG") in connection with an investigation by

that office concerning Mr. Griles' compliance with the ethics laws.  OGE <u>Vaughn</u> No. 13;

Declaration of Jack L. Rohmer, dated September 22, 2003 ("Rohmer Decl.") (filed

herewith), ¶¶ 2-3.  The timeline, which OGE withheld at the OIG's request, includes an

11-page, chronological series of entries setting forth the name of an individual, an event

in which that individual participated or was involved, and the date on which the event

occurred.  A twelfth page sets forth the full names and positions of the persons referred to

on the timeline.  Rohmer Decl., ¶ 3.

The timeline was properly withheld pursuant to FOIA Exemption 7(A).

Exemption 7(A) protects "records or information compiled for law enforcement purposes,

but only to the extent that production of such law enforcement records or information

(A) could reasonably be expected to interfere with enforcement proceedings . . .."

5 U.S.C. § 552(b)(7)(A).  As explained by OIG's Director of Analysis and Forensics, the

timeline was prepared for purposes of an ongoing OIG investigation of a senior DOI

official, in accordance with OIG's mandate under the Inspector General Act of 1978, Pub.

L. No. 94-452, to investigate alleged violations of civil or criminal laws, regulations,

and/or ethical standards arising from the conduct of DOI employees. Rohmer Decl., ¶¶ 2-3; see Ortiz v. Dep't of Health and Human Servs., 70 F.3d 729, 732-33 (2d Cir. 1995).

Release of the timeline also "could reasonably be expected" to interfere with OIG's ongoing investigation. 5 U.S.C. § 552(b)(7)(A); Alyeska Pipeline, 856 F.2d 309, 311 & n. 18 (D.C. Cir. 1988). Because the timeline sets forth a chronological series of events, the dates on which they took place, and the individuals involved, it indicates who investigators may have spoken to, and the evidence they have gathered to date. Rohmer Decl., ¶ 5. Disclosing such information could do harm to an investigation by alerting potential subjects and targets to the scope and direction of the inquiry, and could compromise OIG's ability to obtain additional untainted evidence by altering the recollection of witnesses (or permitting subjects of the investigation to influence the recollection of witnesses they believe investigators may speak to next). Rohmer Decl., ¶ 6; Alyeska, 856 F.2d at 312.[14]

---

[14] For similar reasons, the timeline is protected by the deliberative process and work product privileges, and is therefore exempt from disclosure under Exemption 5, as well. The timeline, first, is pre-decisional; OIG prepared the timeline as part of its process of deciding whether Mr. Griles has complied with the ethics laws. Rohmer Decl., ¶ 7. It is also deliberative, insofar as entries on the timeline reflect investigators' mental impressions as to what individuals and events are material to that decision. The timeline falls, therefore, within the ambit of the deliberative process privilege, and is exempted from disclosure under the FOIA. Because the timeline was also prepared in anticipation of litigation, see Rohmer Decl., ¶ 8, it is also protected by the work product privilege, and by that same token, exempted from disclosure under the FOIA. Safecard Servs., Inc. v.SEC, 926 F.2d 1197, 1202 (D.C. Cir. 1991).

The timeline is also subject to withholding under Exemption 7(C), as a law enforcement record the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Each entry on the timeline contains the names of one or more individuals involved in an event that OIG deemed potentially material to its inquiry into whether Mr. Griles may have violated ethics laws and regulations. Rohmer Decl., ¶ 10. These individuals have a strong privacy interest in not being associated with alleged improper or unlawful activity simply because their names appear in a law enforcement investigative file, a privacy interest that would be threatened by disclosure of the timeline, and one which courts have time and again held to outweigh the public interest in the few rays of light that information could shed on the activities of the government. Safecard Services, 926 F.2d at 1206. OGE forsook no legal duty under the FOIA when it obliged OIG's request to withhold the timeline.

## I.    OGE Properly Redacted Home Telephone Numbers, Addresses, and Related Information.

(OGE Vaughn No. 16); (Exemption 6)

Among the documents that OGE released in response to plaintiffs' FOIA request is a one-page letter to OGE from plaintiff Friends of the Earth, with four pages of enclosures, concerning Mr. Griles' compliance with ethics laws and regulations. One page of the enclosures is a list of private individuals and government employees who attended a meeting with an EPA official arranged by NES. OGE released this document in full, except for the home addresses, home telephone and fax numbers, and home e-mail

addresses of certain private individuals who attended the meeting.  Glynn Decl., ¶ 18.

OGE properly redacted this information under FOIA Exemption 6, as its release would

result in a clearly unwarranted invasion of these individuals' personal privacy.

Individuals have a "substantial privacy interest" in preventing the unwarranted

disclosure of such personal information as home addresses, telephone numbers, and the

like.  Bavrick v. Cisneros, 941 F. Supp. 1015 (D. Kan. 1996).  Moreover, there is

absolutely no public interest in the disclosure of such information, as it would in no way

shed light on the "operations or activities of the government."  Reporters Committee, 489

U.S. at 775.  Accordingly, weighing the substantial interest individuals have in the

privacy of their personal information, with the absence of any public interest in

disclosure, it is clear that this information was appropriately withheld.  NARFE, 879

F.2d at 879 ("something, even a modest privacy interest, outweighs nothing every time").

**J.      DOI and OGE Properly Redacted Non-Responsive Information.**

(DOI Vaughn No. 54; OGE Vaughn Nos. 17-20)

In connection with its response, the Department released a June 28, 2002 e-mail

message, DOI Vaughn No. 54, that contained material responsive to plaintiffs' request,

but redacted one paragraph that discusses an ethics issue pertaining to a Department

employee other than Mr. Griles, Mr. Cason, or Ms. Hopkins, and is therefore not

responsive to plaintiffs' request.  Simmons Decl., ¶ 30.  Similarly, OGE released four

pieces of routine correspondence with the Department concerning the submission of

completed ethics agreements, and documentation of compliance therewith, by several DOI officials including Mr. Griles.  In releasing these documents, OGE redacted the names and positions of these other officials, who are not subjects of plaintiffs' FOIA requests.  These redactions of non-responsive material prior to release of these documents was proper, as an agency is not required under the FOIA to disclose information that is not sought by the request.  <u>ACLU v. Dep't of Justice</u>, 265 F. Supp. 2d 20, 21-22 (D.D.C. 2003); <u>Billington v. Dep't of Justice</u>, 11 F. Supp. 2d 45, 69 (D.D.C. 1998).

**K.    DOI and OGE Both Complied With Their Obligation
To Release Reasonably Segregable, Non-Exempt
Material from Withheld Records.**

The FOIA requires agencies to release "any reasonably segregable portion of a record" following deletion of the portions that are exempt.  5 U.S.C. § 552(b) (text following exemptions).  What constitutes "reasonably segregable" information depends on both the intelligibility of the records after redaction, and the burden of redaction on the agency.  <u>See Yeager v. Drug Enforcement Admin.</u>, 678 F.2d 315, 322 n. 16 (D.C. Cir. 1982).  Non-exempt portions of a document need not be disclosed if they are inextricably intertwined with exempt portions.  <u>Neufeld v. IRS</u>, 646 F.2d 661, 666 (D.C. Cir. 1981).  An agency may demonstrate that it has released all reasonably segregable information through declarations "show[ing] with reasonable specificity why the documents cannot be further segregated."  <u>Armstrong v. EOP</u>, 97 F.3d 575, 578 (D.C. Cir. 1996).

44 .

In this case, where non-exempt information could be reasonably segregated from the exempt portions of responsive documents, both DOI and OGE released the reasonably segregable portions of those records. <u>See</u> DOI <u>Vaughn</u> Nos. 54-55; OGE <u>Vaughn</u> No. 16. The remaining records were properly withheld in full. As defendants explain in the declarations filed herewith, the 278 workpapers, discussed in part I.C above, consist entirely of material that must be withheld in full to protect the deliberative processes underlying the review and certification of public financial disclosure reports, and to protect the personal privacy of individual filers. Rick Decl., ¶ 34; Simmons Decl., ¶ 15.

The records discussed in part I.D consist entirely of draft ethics agreements, recusals, related certifications, and comments thereon, and, as such, contain no reasonably segregable information that is not subject to withholding on grounds of the deliberative process privilege. Rick Decl., ¶ 27; Simmons Decl., ¶ 20. The same is true of the inter-agency correspondence concerning Mr. Griles, the drafts of that correspondence, and the related, draft internal memoranda, addressed in part I.E. Any factual information contained in this correspondence is the product of DOI's inquiries into that matter, and is itself so reflective of and intertwined with the agencies' thought processes on the matter that revealing this factual information would be tantamount to revealing the agencies' deliberations. <u>Tarullo v. Dep't of Defense</u>, 170 F. Supp. 2d 271, 278 (D. Conn. 2001); Glynn Decl., ¶ 17; Simmons Decl., ¶ 26.

45

The Department properly withheld the confidential financial disclosure reports filed by Mr. Cason and Ms. Hopkins (see part I.F, above), because the EIGA forbids DOI to release any information contained in those reports. 5 U.S.C. App. 4 § 107(a)(2); see Simmons Decl. ¶ 29. Because the draft severance agreement between Mr. Griles and NES, and the NES client list (part I.G, above), consist entirely, as such, of confidential commercial information, DOI also properly withheld those documents in their entirety. See Simmons Decl., ¶¶ 27-28; see generally Himmelstein Decl. OGE also properly withheld the OIG timeline in its entirety (part I.H, above), as it only contains information, compiled by OIG for purposes of its investigation concerning Mr. Griles, that is subject to withholding under Exemption 7. Rohmer Decl., ¶ 10.

*     *     *

For all of the foregoing reasons, defendants have met each of their obligations under the FOIA in responding to plaintiffs' requests. Accordingly, defendants are entitled to summary judgment on Claims One and Two of the Complaint.

## II.   CLAIMS THREE AND FOUR OF THE COMPLAINT SHOULD BE DISMISSED.

Claims Three and Four of the Complaint should be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Claim Three asserts that defendants "violated the FOIA by failing to provide a Vaughn index, or an equivalent thereof, for their withholdings." Complaint, ¶ 72. The purpose of a Vaughn index, however, is to allow "*the District Court* to make a rational decision [about] whether the

46

withheld material must be produced without actually viewing the documents themselves,"

and to "permit adequate adverse testing of the agency's claimed right to an exemption"

once the matter is in litigation." King v. Dep't of Justice, 830 F.2d 210, 217-219 (D.C.

Cir. 1987) (emphasis added).  Accordingly, the requirement for a Vaughn index "is

imposed in connection with a motion for summary judgment filed by a defendant in a

civil action pending in court." Schwarz v. Dep't of Treasury, 131 F. Supp 2d 142, 147

(D.D.C. 2000).  An agency is not required to prepare a Vaughn index during the

administrative process.  Id. ("there is no requirement that an agency provide a . . .

'Vaughn' index on an initial request for documents"); Judicial Watch, Inc. v. Clinton, 880

F. Supp. 1, 11 (D.D.C. 1995).

Claim Four maintains that DOI violated the FOIA when it exceed the 20-day

statutory time limit to resolve plaintiffs' appeal of the Department's "adverse

determination" to withhold documents responsive to the DOI Request.  Similarly, Claim

Four asserts that OGE violated the FOIA when it failed to respond to the OGE Request

within the 20 business days allotted under the statute.  Complaint, ¶¶ 74-78.  The FOIA

indisputably requires agencies to determine within 20 business days whether they will

comply with a FOIA request, and likewise to make a determination with respect to any

appeal within 20 business days.  5 U.S.C. § 552(a)(6)(A)(i), (ii).

At the same time, however, the FOIA specifies the requester's remedy when

agencies fail to comply with these deadlines.  Subparagraph (a)(6)(C)(i) provides that a

person making a FOIA request "shall be deemed to have exhausted his administrative remedies . . . if the agency fails to comply with the applicable time limit provisions of [subparagraph (6)(A)]." As a result, "[a] requester . . . may seek judicial review immediately . . . if the agency fails to answer the request within twenty days." Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1310 (D.C. Cir. 2003); Oglesby, 920 F.2d at 61 ("[i]f the agency has not responded within the statutory time limits . . . the requester may bring suit"). Having commenced this suit to enjoin defendants from continuing to withhold records responsive to their requests, plaintiffs have already exercised the rights afforded to them by § 552(a)(6) to their full extent, and there is no further relief to be given them for defendants' failure to meet the deadlines prescribed therein.

## CONCLUSION

For the foregoing reasons, the Court should award summary judgment to defendants on Claims One and Two of the Complaint, and Claims Three and Four should be dismissed for failure to state claims upon which relief can be granted.

Dated: September 25, 2003

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

ROSCOE C. HOWARD, JR.
United States Attorney

48

Of Counsel:

HUGO TEUFEL, III
Associate Solicitor
Division of General Law

TIMOTHY MURPHY
Attorney-Adviser

Office of the Solicitor
Division of General
U.S. Dep't of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

WILLIAM E. GRESSMAN
Senior Associate General Counsel

ELAINE NEWTON
Attorney-Advisor

U.S. Office of Government Ethics
1201 New York Avenue, N.W.
Washington, D.C.  20005-3917

ELIZABETH J. SHAPIRO
Assistant Branch Director


JAMES J. GILLIGAN
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
(202) 514-3358

Counsel for Defendants United States
Department of the Interior and the United
States Office of Government Ethics

49