**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | ) | Case No. 1:03 CV 01192 (ESH) |

DECLARATION OF SUE ELLEN SLOCA

I, Sue Ellen Sloca, hereby declare as follows:

1. I am currently the Freedom of Information Act (FOIA) Officer for the Office of the Secretary (OS), United States Department of the Interior (Department), and I have held this position for ten years. In this capacity, I am familiar with the steps taken by the Department to respond to the September 25, 2002, FOIA request by Plaintiffs Defenders of Wildlife and Friends of the Earth. All information herein is based upon my knowledge or upon information furnished to me in my official capacity.

2. The Department operates a decentralized FOIA program, in which the various bureaus, activities, and agency components separately process and respond to FOIA requests addressed to them. The Office of the Secretary responds to requests addressed to a number of offices,

specifically the Secretary of the Interior, and the Secretary's Immediate Offices, which include the Office of the Deputy Secretary, the Executive Secretariat, the Office of Congressional and Legislative Affairs, the Office of Communications, and the Office of External Affairs. The OS occasionally responds on behalf of other Departmental components as well.

3. On September 26, 2002, the Office of the Secretary received a FOIA request from Plaintiffs, dated September 25, 2002 (hereafter "FOIA Request"). A copy of the FOIA Request is attached to this declaration as Exhibit A. The FOIA Request is referred to in Paragraph 41 of the Complaint. On the date of receipt of the FOIA Request, I reviewed the it to determine the nature of the materials sought. The FOIA Request involved ethics-related records on three individuals: J. Steven Griles, the Deputy Secretary of the Interior; James Cason, the Associate Deputy Secretary; and Holly Hopkins, Special Assistant to the Deputy Secretary. These individuals all work within the Secretary's Immediate Office. Given the nature of the records sought, they were likely to be in the possession of the Secretary's Immediate Office, or the Department Ethics Office. That being the case, I referred the request to Nancy Appler, who handles FOIA requests for the Secretary's Immediate Offices, including the Deputy Secretary's office. Ms. Appler began conducting the actual search for documents on September 26, 2002, by giving each of the named individuals a copy of the FOIA request and asking them to search their files for any responsive records. No one else in the Secretary's Immediate Offices was asked to search for responsive documents, because the requested records are personal to the individuals and are not kept in files other than any that might be maintained by Mr. Griles, Mr. Cason and Ms. Hopkins. She also gave a copy of the FOIA Request to Shayla Simmons, Director of the Department's Ethics Office, to conduct a search of that Office's files, as those files would be

most likely to have documents responsive to the FOIA Request. The Department Ethics Office began to search its files, including the individual paper files on each of the individuals named in the FOIA Request, along with their email system and other electronic documents. It copied the responsive materials that were located, and reviewed them for release, eventually providing them to me for release.

4. After the Department Ethics Office collected the materials in its files, Ms. Simmons discussed the responsive materials from the Ethics Office's files with Holly Hopkins, who, as Mr. Griles' Special Assistant, is responsible for maintaining his files. On November 14, 2002, they reviewed the request together and determined that all responsive documents resided with the Department Ethics Office. Additionally, Mr. Griles and Mr. Cason reviewed the responsive materials to ensure that they did not have any additional documents. Neither Mr. Griles, Mr. Cason, or Ms. Hopkins had any additional responsive documents, either because they had never generated such documents or because the potentially responsive documents had been generated prior to the start of their employment with the Department and had never come within the Department's possession or control. As a result, all of the materials produced in response to the FOIA Request came from the Department Ethics Office, with the search concluding on November 14, 2002. In the course of conducting this search, the Department placed no date restrictions on its request for responsive documents.

5. On October 25, 2002, I sent a letter to Mr. William Snape and Mr. Kumar Vaswani, who had submitted the FOIA Request on behalf of Plaintiffs (the "requesters"), informing them of their fee waiver status and explaining that the forms they submitted requesting the SF 278 Public Financial Disclosure Report(s) for Mr. Griles, Mr. Cason, and Ms. Hopkins were being

forwarded to the Department Ethics Office. I also explained that the Department needed an extension of time to process the request. A copy of this letter is attached as Exhibit B. While the FOIA Request was still being processed, I received the SF 278s from the Department Ethics Office. Since these particular documents were ready at that time for release, I sent Messrs. Snape and Vaswani an interim response enclosing the SF 278s in response to item 1 of the FOIA request. A copy of this letter is attached to this declaration as Exhibit C.

6. After I released the SF 278s, Mr. Vaswani notified the Department that Mr. Griles' SF 278 for the year 2001 had not been included in our previous interim response. On January 3, 2003, I sent the requesters a letter enclosing Mr. Griles' SF 278 for 2001, which had been inadvertently omitted from our previous interim response. A copy of this letter is attached to this declaration as Exhibit D. The Department finished its processing of the request shortly thereafter, and forwarded responsive documents to the requesters by letter dated January 8, 2003. A copy of this letter is attached to this declaration as Exhibit E. In the letter, I also informed the requesters that the Department withheld certain documents under FOIA Exemptions (4), (5), and (6). I explained the application of those exemptions and provided the requesters with a list describing the withheld records, concluding the Department's response to the FOIA request. I further advised the requesters that one document responsive to their FOIA request, a three-page letter authored by the Office of Government Ethics ("OGE"), had been referred to OGE for a release decision pursuant to Department FOIA regulations, and that OGE would respond to the requesters directly concerning this document. I further advised the requesters that one document responsive to their FOIA request, a three-page letter authored by the Office of Government Ethics ("OGE"), had been referred to OGE for a release decision pursuant to Department FOIA

regulations, and that OGE would respond to the requesters directly concerning this document.

7. By letter dated February 4, 2003, the requesters, Defenders of Wildlife and Friends of the Earth, joined by the Endangered Species Coalition, submitted an administrative appeal from the Department's response to their request. A copy of this letter is attached to this declaration as Exhibit F. As the first basis for their appeal, the requesters stated that documents responsive to their request that they believed to be in the Department's possession were neither released, nor included on the list of withheld documents attached to the Department's response to their FOIA request. Second, they stated that the Department had not fully addressed some of the records in their request. Third, they disputed the application of the FOIA exemptions identified by the Department to the withheld documents.

8. In response to the requesters' appeal, the Office of the Secretary was directed to conduct a second search for responsive documents, in light of references in the appeal to specific types of documents the requesters were seeking. A search was again conducted within the Secretary's Immediate Office, and the Department Ethics Office, but no additional records responsive to the request were located. By letter dated March 3, 2003, a copy of which is attached to this declaration as Exhibit G, the Department responded to the requesters' administrative appeal, informing them that their appeal of the Department's withholdings was under review in the Office of the Solicitor, but that their appeal in all other respects was denied.

9. By letter dated September 25, 2003, the Department released to Messrs. Snape and Vaswani an additional 42 pages of responsive documents.

10. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of September, 2003.

Sue Ellen Sloca
Office of the Secretary
FOIA Officer




September 25, 2002

**Freedom of Information Act Request**

**By Facsimile (202 219-0813) and Hand Delivery**

02-C-402




Sue Ellen Sloca
FOIA Officer
U.S. Department of the Interior
MS-1413, MIB
1849 C Street, NW
Washington, DC 20240

Re: Freedom of Information Act Request on Matters Concerning U.S. Department of the Interior Officials

Dear Ms. Sloca :

Defenders of Wildlife and Friends of the Earth make this request for documents pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 et seq., and the Ethics in Government Act of 1978, as amended, 5 U.S.C. App. §§ 101 et seq., as well as agency regulations, 43 C.F.R. Part 2, Subpart B, and 5 C.F.R. Parts 2604 and 2634. This request relates to the official duties of various U.S. Department of the Interior (hereinafter "DOI") officials, including J. Steven Griles, Holly Hopkins, and James Cason.

**Background**

Mr. Griles was nominated to serve as Deputy Secretary of the Interior on April 30, 2001, and was confirmed by the Senate on July 12, 2001. Previously, Mr. Griles was Vice President and Principal for National Environmental Strategies (NES) and President of J. Steven Griles and Associates. During his Senate confirmation hearings, questions were raised regarding the financial interests of Mr. Griles and the possibility of a conflict of interest with his official duties as Deputy Secretary. In April 2001, Mr. Griles reportedly signed a letter in which he stated he would resign his

National Headquarters
1101 Fourteenth Street, NW
Suite 1400
Washington, DC 20005
Telephone 202-682-9400
Fax 202-682-1331
www.defenders.org
www.kidsplanet.org

Printed on Recycled Paper

Sloca Declaration
Exhibit A

position as Vice President and Principal of NES and as President of J. Steven Griles and Associates. He further stated that he would sell his client list and his interest in these firms for book value to NES, with payment to be received by him over a period of four years. The payments will reportedly be $284,000 annually. Mr. Griles acknowledged that this disposal arrangement constituted a continuing financial interest for him. Mr. Griles reportedly agreed:

- to recuse himself, for the duration of his continuing financial interest regarding the disposal of his interests, from participating personally and substantially as a Federal employee in any particular matter which would have a direct and predictable effect on the ability or willingness of NES to make the agreement payments;

- to recuse himself for the duration of the continuing financial interest regarding the disposal of his interests from acting in any particular matter involving specific parties in which NES, Inc. is a party or represents a party;

- to recuse himself, for two years after the final payment is received, from participating in any particular matter involving specific parties in which National and/or NES is a party or represents a party, unless he receives a written waiver pursuant to 5 C.F.R. § 2635.503(c);

- to recuse himself, for the duration of his financial interest regarding his defined benefit pension plan, from participating personally and substantially in any particular matter that will have a direct and predictable effect on the ability or willingness of NES, Inc. to provide this contractual benefit;

- to recuse himself, until the sale of his interests in J. Steven Griles and Associates is complete, from participating personally and substantially as a federal employee in any particular matter which would have a direct and predictable effect on J. Steven Griles and Associates; and

- to recuse himself for one year from the date of his appointment from any particular matter involving specific parties in which any of his former clients is a party or represents a party, unless written authorization is received pursuant to 5 C.F.R. § 2635.502(d).

On August 1, 2001, Mr. Griles signed a second recusal agreement purporting to reduce the recusal period to just one year. This agreement stated that his first recusal regarding his former employer was for the duration of only one year, when in fact it was much longer--the duration of the payments plus 2 years, and possibly even longer, because of his participation in a defined benefit plan.

On April 12, 2002, Mr. Griles signed a memorandum to the Environmental Protection Agency urging that agency not issue a letter that the Draft Environmental Impact Statement (EIS) for a coal bed methane project in Wyoming was deficient. J. Steven Griles and Associates and NES represented several private entities that are involved in this project and that were affected by

Mr. Griles's action. On the surface, therefore, Mr. Griles's action seems to violate the terms of both of Mr. Griles's recusal agreements, as well as the provisions of 18 U.S.C. § 208(a) (regarding conflicts of interest by Federal employees). In response, the Department of the Interior Office of the Solicitor sent Mr. Griles a May 3, 2002, memo requesting that he recuse himself from decisions regarding the EISs at issue.

On May 8, 2002, Mr. Griles signed a third agreement to recuse himself "from participating in any activities related to the above described [Environmental Impact] Statements."

Ms. Holly Hopkins is Mr. Griles's Special Assistant and is a former employee at NES. Mr. James Cason is the Associate Deputy Secretary of the Interior and is Mr. Griles's subordinate.

**Conflict of Interest Law**

The conduct of Federal employees is strictly regulated as a matter of law and policy. As President Bush stated on his first day of office, "[e]veryone who enters into public service for the United States has a duty to the American people to maintain the highest standards of integrity in Government." Memorandum for the Heads of Executive Departments and Agencies, January 20, 2001. The President also reminded department heads that "[e]mployees shall not hold financial interests that conflict with the conscientious performance of duty." Id. at ¶ 2. This was echoed by Secretary of the Interior Gale Norton, when she stated, "I would like to add my support to the President's Memorandum. It is very important to me that all Department of the Interior employees become familiar with and observe all the standards of official conduct as they pursue their daily responsibilities." Message to All New and Present Employees by Gale Norton, at http://www.doi.gov/ethics/nortonmessage.html.

With limited exceptions, Federal law prohibits conflicts of interest by Federal employees. 18 U.S.C. § 208(a) states:

> Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government . . . participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest, shall be subject to the penalties set forth in section 216 of this title.

18 U.S.C. § 216 provides for criminal and civil penalties for violations of section 208.

Regardless of any recusal agreements purporting to limit the time during which an agency official must refrain from participating in certain matters, he or she is still subject to the requirements of 18 U.S.C. § 208.

**Ethics in Government Act**

The Ethics in Government Act of 1978, as amended, 5 U.S.C. App. § 101 et seq., (hereinafter, "the Act") provides for periodic public disclosure of certain Federal employees' financial interests and for review of disclosure reports by the Office of Government Ethics. Executive branch-wide regulations promulgated pursuant to the Act also regulate the conduct of federal employees. 5 C.F.R. Chapter XVI. Conduct of Department of Interior employees is also regulated by 5 C.F.R. Part 3501 and 43 C.F.R. Part 20. In particular, 43 C.F.R. § 20.103 states, "It is the responsibility of each employee to be familiar with and to comply with all Federal statutes, Executive Orders, and regulations that govern his or her conduct." Moreover, "[a]n employee shall not use his public office for his own private gain. . ." 5 C.F.R. § 2635.702. Where the employee's participation would violate 18 U.S.C. § 208(a), "an employee shall disqualify himself from participation in the matter in accordance with paragraph (c) of this section or obtain a waiver or determine that an exemption applies." 5 C.F.R. § 2635.402(a).

The public disclosure requirements of the Act apply, inter alia, to "each officer or employee in the executive branch . . . who occupies a position classified above GS-15 of the General Schedule," and "any employee . . . who is in a position in the executive branch which is excepted from the competitive service by reason of being of a confidential or policymaking character," 5 U.S.C. App. § 101(f) (3), (5), as well as appointees to these positions. An individual who is appointed to such a position must file a report either within 30 days of assuming such a position, 5 U.S.C. App. § 101(a), or upon nomination for a position requiring Senate confirmation, 5 U.S.C. App. § 101(b)(1). Incumbents of such positions must file a public disclosure report annually, by May 15. Id. at § 101(d).

Public disclosure reports require an array of financial information (subject to threshold levels), including the source, type, and value of income from any source (other than from U.S. Government employment), 5 U.S.C. App. § 102(a)(1); gifts, id. at §102(a)(2)(A); reimbursements, id. at § 102(a)(2)(B); the identity and value of investment property held, id. at § 102(a)(3); a description of the purchase or sale of stocks and other forms of securities, id. at § 102(a)(5)(B); identity of all positions held for the prior two years as an officer, director, or proprietor of an organization or business entity, id. at § 102(a)(6)(A); the identity and source of any compensation received, id. at § 102(a)(6)(B); and a description of the terms of any agreement or arrangement regarding continuation of payments by a former employer, id. at § 102(a)(7).

Public disclosure reports must be released to members of the public upon request. 5 U.S.C. App. § 105(b)(1), (d).

**Request**

Defenders of Wildlife ("Defenders") and Friends of the Earth ("FoE") request that you send:

1. all financial disclosure reports, including Forms SF 278, filed by J. Steven Griles, Holly Hopkins, or James Cason pursuant to the Ethics in Government Act of 1978, as amended, 5 U.S.C. App. § 101 et seq., and 5 C.F.R. Part 2634.

2. any documents relating to the financial interests of Mr. Griles, Ms. Hopkins, or Mr. Cason, including, but not limited to retirement, pension, or investment plans with non-U.S. government entities.

3. any documents relating to ethics agreements (whether oral or written) with J. Steven Griles, Holly Hopkins, or James Cason. This request includes agreements described in 5 U.S.C. App. § 110 and 5 C.F.R. § 2634.802 and specifically includes any recusal, divestiture, or resignation agreements themselves, including a correspondence from J. Steven Griles to Wendell Sutton, DOI Human Resources Office, during 2001, in which Mr. Griles agreed to recuse himself regarding matters concerning J. Steven Griles and Associates, National Environmental Strategies, or NES, Inc.;

4. all documents relating to contracts, agreements, or communications, including the contracts and agreements themselves, between Mr. Griles and:

a) his former and/or current clients;
b) J. Steven Griles and Associates;
c) National Environmental Strategies; and/or
d) NES, Inc.;

5. any documents regarding Mr. Griles, Ms. Hopkins, or Mr. Cason generated pursuant to 5 C.F.R. Parts 2634, 2635, or 2640, including, but not limited to:

a) written disqualification statements pursuant to 5 C.F.R. § 2635.402(c),

b) requests for, and authorizations granting, waivers pursuant to 5 C.F.R. Parts 2635 or 2640, or any other regulation or law regarding personal and business relationships of Federal employees,

c) any disclosures and any determinations made pursuant to 18 U.S.C. § 208(b)(1) or 5 C.F.R. § 2635.403(b). See also 18 U.S.C. § 208(d)(1).

For purposes of this FOIA request, the term "documents" includes but is not limited to correspondence, memos, notes, records, reports, videos, photographs, computer disks, maps,

electron c mail, and any other applicable or relevant data or information.

**Fee Waiver Request**

Both the FOIA and the Ethics in Government Act, as well as agency regulations, provide for a waiver of fees associated with processing a FOIA and Ethics in Government Act request. 5 U.S.C. § 552(a)(4)(A)(iii), 43 C.F.R. § 2.21, 5 U.S.C. App. § 105(b)(1), 5 C.F.R. § 2604.503. We are entitled to a fee waiver under both the statute and regulations. The subject of this request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant governmental procedures by Defenders, FoE and the general public in a significant way, and the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987).

Defenders is a non-profit organization under Section 501(c)(3) of the Internal Revenue Code, with approximately one million members and supporters. Defenders is dedicated to the protection and recovery of imperilled wildlife species and their habitats. Long known for its leadership role on endangered species issues, Defenders uses a combination of education, research, litigation, and advocacy to advance its mission. Defenders regularly submits comments and participates in a variety of federal government actions, including those under the MMPA, Endangered Species Act, National Environmental Policy Act, relevant international agreements, and the like. We also educate our members and the general public on wildlife conservation issues through our magazine *Defenders*, action alert mailings, computer media, press releases, public service announcements on television and radio, and other related mechanisms. Our members and the general public are acutely interested in how the federal government establishes and implements efforts to protect and conserve imperiled species in furtherance of our organization's overall objectives on behalf of biological diversity.

FoE is a national environmental organization, with an office dedicated to preserving the health and diversity of the planet and empowering citizens to have an influential voice in decisions affecting their environment. FoE is a registered §501(c)(3) corporation, and the release of the requested information is not in FoE's commercial interest. FoE will analyze the information responsive to this request, and will likely share its analysis with its members and the public either through memorandums or reports, often made available on its Internet site: www.foe.org.

Under these circumstances, Defenders and FoE fully satisfy the criteria for a fee waiver.

**Conclusion**

As provided by the FOIA, we expect a reply to this request within twenty business days

of receipt. 5 U.S.C. § 552(a)(6)(A)(i). Please do not hesitate to call us if we can be of further assistance. We look forward to your reply.

Sincerely,

William J. Snape, III
Vice President
Defenders of Wildlife

Kumar Vaswani
Walter Kuhlmann Legal Fellow
Defenders of Wildlife

Enclosures: Completed OGE Form 201

Washington Post article, "Official's Lobbying Ties Decried," September 25, 2001, p. A1

cc: Kristen Sykes, Friends of the Earth

U.S. Office of Government Ethics
OGE Form 201 (October 1999)

Form Approved: OMB No. 3209 - 0002

# Request to Inspect or Receive Copies of SF 278 Executive Branch Personnel Public Financial Disclosure Report or Other Covered Record

## I. Application

Agency Use Only

1. Applicant's name and address (please print): WILLIAM J. SNAPE, III, DEFENDERS OF WILDLIFE 1101 14th St. N.W. #1400, WASH DC 20005

2. Date: 9-25-02

1a. Office telephone number: (202) 682-9400 ext. 118 (Optional)

3. Occupation: Attorney

4. If application is for or on behalf of any other person or organization, give the other's name: FRIENDS OF THE EARTH

4a. Address of the other person or organization: 1025 VERMONT AVE., N.W. WASH. D.C. 20005

5. ☒ Copy of ~~the most recent (or other, specify)~~ ALL Public Financial Disclosure Report Form SF 278 requested for the following named individual(s):

a. J. Steven Griles

b. Holly Hopkins

c. James Cason

d.

e.

f.

Certain other types of records ("covered records") can also be requested using this form (See Part III below); if you are requesting another covered record, check this box ☒ and specify which type of record(s): See attached letter.

6. Applicant's signature: [signature]

## II. Notice of Action

☐ Copies of the report(s) or other covered record(s) you requested are enclosed. See the **Important Notice** below.

☐ Your request does not comply with the requirements of the statute. Please complete Part I of this form and return so we may comply with your request.

☐ Other. Explanation: ______

☐ Fees. If applicable, amount: ______ (when fees are required, make out a check payable to the U.S. Treasury and send it to the executive branch agency processing this request form).

### A. Important Notice

The law and implementing OGE regulations require that a report or other covered record not be available to any person except upon written application by such person stating his or her name, occupation and address, and that the person be aware of the prohibitions on improper use, set forth below.

Section 105(c) of the Ethics in Government Act of 1978, as amended and 5 C.F.R. § 2634.603(f) of the implementing OGE regulations provide that it is unlawful for any person to obtain or use a report:

(1) for any unlawful purpose;

(2) for any commercial purpose, other than by news and communications media for dissemination to the general public;

(3) for determining or establishing the credit rating of any individual; or

(4) for use, directly or indirectly, in the solicitation of money for any political, charitable, or other purpose.

The Attorney General may bring a civil action against any person who obtains or uses a report for any such prohibited purpose as set forth above. The court may assess against such a person a penalty in any amount not to exceed $11,000. Such remedy shall be in addition to any other remedy available under statutory or common law.

*(form continued on reverse side)*

Wash Post 9-25-02, p.A1

# Official's Lobbying Ties Decried

## *Interior's Griles Defends Meetings as Social, Informational*

*By* ERIC PIANIN
*Washington Post Staff Writer*

When several senators voiced concern in May 2001 that his extensive lobbying ties might conflict with his new job as deputy interior secretary, J. Steven Griles insisted it wouldn't be a problem.

"I will do my utmost . . . to prevent the appearance of any improprieties or conflicts in terms of my prior associations," Griles told the Senate Energy and Natural Resources Committee during his confirmation hearing. He signed two letters pledging to recuse himself for up to six years from matters that could affect his former lobbying firm or the array of utilities, mining companies and other energy producers he represented.

Within weeks of taking office, Griles began a series of meetings with former clients and administration officials on regulatory matters important to several of his former clients.

Griles, 54, says he has violated neither his pledge to the senators nor federal guidelines meant to curb conflicts of interest. Some environmental groups disagree, however, and a U.S. senator has called for an investigation.

A review of Griles's activities shows that he has met frequently with some of the energy industry leaders he once represented. For example, he met at least three times with Harold P. Quinn Jr. and other senior officials of the National Mining Association between Aug. 16, 2001, and Jan. 8, while the industry group—a former client—was lobbying the administration to loosen standards

See GRILES, A10, Col. 1



BY DAVID GRUBBS—BILLINGS GAZETTE VIA ASSOCIATED PRESS

**Deputy Interior Secretary J. Steven Griles says he has not violated guidelines meant to curb conflicts of interest. Some critics disagree.**



# Interior's Griles Defends Meetings

GRILES, *From A1*

for mountaintop mining operations and preserve a hardrock mining law highly favorable to the industry.

He also took part in a meeting on Sept. 10, 2001, with a dozen top executives of another former client, the Edison Electric Institute, to discuss Bush administration plans to relax clean-air enforcement actions against aging coal-fired power plants but to seek tough new industry-wide standards for emissions of sulfur dioxide, nitrogen oxide and mercury. Accounts of the meetings come from Washington Post interviews and official government logs obtained by two environmental groups, Friends of the Earth and the Citizens Coal Council.

Federal ethics statutes and regulations are open to wide interpretation. Generally, however, they prohibit a government official from knowingly participating "personally and substantially" in any "particular matter" that could affect his or her own financial interests or that involves a former employer or client of that employer. The stated intent is to avoid a situation in which "a reasonable person" familiar with relevant facts would question the official's impartiality.

In a recent interview, Griles said his meetings with former clients were largely social or informational in nature, and that he never took part in administration deliberations over "any particular matter" that might directly affect his former lobbying firm or clients. When in doubt, he said, he obtained approval for his scheduled meetings from the Interior Department's ethics lawyer to avoid the possibility of a conflict of interest. More than once, he said, he backed out of meetings when it appeared he would be discussing matters of direct interest to former clients. "We are all as scrupulous as we can be to assure that I will not be involved in any particular matter that would violate the ethics agreement or even have the appearance of a conflict of interest," Griles said. "The president said he wanted this administration to be held to the highest ethical standards, and I don't want it ever to be said that I didn't."

## Maintaining Contacts

As the Interior Department's No. 2 official, Griles is responsible for managing the government's vast mineral and land holdings as well as conferring with other departments and the White House on a broad range of energy-related issues with substantial environmental consequences and financial implications for the energy industry.

While maintaining contacts with former clients and industry associates, Griles had at least 32 meetings with executive branch officials on pending mining and clean-air regulatory matters that were of concern to several of his former clients. Those meetings occurred between July 27, 2001, and Feb. 20, according to the logs.

Griles's critics say he flouted his recusal agreements and government conflict-of-interest rules by repeatedly involving himself in issues with significant economic consequences for his former industry clients.

"The biggest thing is that Mr. Griles said he wouldn't be involved in any particular matter that impacts his previous clients and employer, and he clearly was involved in discussions about rule-making that have weakened environmental laws and have had positive impacts on his previous clients," said Kristen Sykes, a researcher for Friends of the Earth.

Carolyn Johnson, staff director of the Citizens Coal Council, said Griles "just didn't hold back at all."

Sen. Ron Wyden (D-Ore.), one of four energy committee members who voted against Griles's nomination, said last week that the Interior Department's inspector general should investigate Griles's conduct to determine whether he directly or indirectly helped his former lobbying firm and clients, as some are alleging. "I think that it's critical to get to the bottom of this situation and not have the public wondering if powerful special interests get dealt a winning hand, with Mr. Griles doing the dealing," Wyden said.

Griles maintains a financial link to one of his former Washington lobbying firms, National Environmental Strategies. It was founded in 1990 by Marc Himmelstein and Haley Barbour, before Barbour became chairman of the Republican National Committee. As a condition of his July 12, 2001, Senate confirmation, Griles sold his interest to Himmelstein and closed another firm called J. Steven Griles & Associates.

Under the sales agreement, Himmelstein's firm is paying Griles $284,000 annually for four years. Griles began receiving installments on the roughly $1.1 million purchase agreement last year, on top of his $150,000 annual government salary.

Griles pledged in one of his recusal letters to take no action that would affect his former firm's "ability or willingness" to continue making the payments. Last week, he defended the arrangement as a reasonable business transaction that would not leave Himmelstein's lobbying firm strapped for cash. Himmelstein said recently that, since Griles moved to Interior, the two men have continued to socialize, occasionally getting together for a beer or dinner, but that "We don't talk about work. We're not allowed."

## Barred From Certain Issues

The Bush administration has recruited scores of corporate executives and industry lobbyists to serve in key regulatory posts, particularly at the Energy Department, the Environmental Protection Agency and Interior. Many of these officials are barred by law and administrative policies from handling certain issues for a year or more because of the potential for conflicts of interest involving former employers.

Interior Secretary Gale A. Norton, a Colorado lawyer and onetime advocate for western property interests, and at least 10 other high-ranking Interior officials have recused themselves from certain government activities that might affect their former employers, clients, or



# s With Former Clients

industry-backed foundations, according to department documents.

Griles, a mid-level Interior official in the Reagan administration and onetime Virginia coal company vice president, has generated concern among environmentalists and some lawmakers because of his extensive industry ties and his reputation for aggressively pushing to loosen environmental restrictions to open more public land to drilling and mining. The Washington Post reported earlier this year that Griles had intervened in a dispute over a massive coal methane gas extraction project involving energy companies he once represented. Griles wrote a memorandum challenging an EPA report critical of the country's largest domestic energy exploration project, in Wyoming's Powder River Basin.

The Interior Department's lawyers concluded in April that Griles's memo did not violate ethics rules or his recusal agreement. Griles said he subsequently signed another agreement, on May 8, specifically disqualifying himself from coal-bed methane issues "for the world to know I'm not even going to be talking to anybody about it again."

The Interior Department logs cite several meetings between Griles and Quinn, the National Mining Association's senior vice president. The two men had lunch on Aug. 16, 2001, and then met again on Nov. 29. A spokesman for Quinn described the lunch as a "social gathering," and said Quinn couldn't recall the second meeting's purpose.

The National Mining Association was concerned at the time about the administration's deliberations over a proposed rule change to make it easier for mining companies to dump dirt and rock waste from mountaintop mining operations into adjoining valleys and streams—a move strongly supported by the group. The rule change—which eventually was approved by the EPA and the Army Corps of Engineers April but then blocked by a federal court ruling—would have provided a major boost to low-sulfur coal mining operations in West Virginia and Kentucky and would have stepped up hardrock mining in western states.

According to an Interior department routing slip, Quinn sent Norton a "courtesy copy" of his analysis of the draft rule changes on Dec. 3, 2001, highlighting his group's concerns and criticisms and recommending deletions. Quinn says he never sent the memo. Griles said that he may have discussed mountaintop mining with Quinn in passing, but that he doesn't recall any substantive discussions or Quinn's memo.

On Jan. 8, Quinn visited Griles again, accompanied by mining association president Jack Gerard and four other officials. This meeting was for "a more general discussion of the outlook for mining reform," according to Carol Raulston of the National Mining Association, who attended the 7 a.m. session.

Mining association officials were alarmed by a letter Norton had sent to Congress in October 2001 saying she would support changes in an 1872 law governing hardrock mining on federal lands that likely would add to industry's costs and impose new federal management constraints. "We were there to discuss where that effort was headed from the industry perspective," said Raulston.

Griles said that at most he briefed the mining executives on where the deliberations stood, but that he referred them to another Interior official to talk specifics. Norton never formally proposed legislation to revise the mining law.

## Policy Deliberations

Griles has also been involved in deliberations over clean-air enforcement policy and initiatives, a topic handled primarily by the EPA and the Energy Department. According to his calendar, Griles attended at least 16 meetings with other administration officials or industry groups or advocates to discuss air pollution issues. One of those sessions, on Oct. 5, 2001, included White House political adviser Karl Rove, according to the logs.

On Aug. 30, 2001, Griles was briefed on air pollution issues by the Electric Power Research Institute, an industry group represented by Himmelstein. On Sept. 10, Griles attended a meeting organized by James Connaughton, the White House environmental adviser, with 12 utility executives who belong to the Edison Electric Institute, another former Griles client.

Dan Riedinger, a spokesman for the institute, said the officials discussed two matters of major concern to the utility industry: One was the administration's progress in rewriting "New Source Review" rules to reduce the number of government suits brought against older coal-fired power plants for violations of the Clean Air Act, a move heartily endorsed by the industry. The other was an administration proposal dubbed "Clear Skies," intended to sharply reduce industry-wide emissions of sulfur dioxide, nitrogen oxide and mercury, which can cause serious health problems.

Officials of the Edison Electric Institute were troubled by aspects of "Clear Skies" and provided Connaughton, Griles and others with computer analyses highlighting the potential adverse affects of such an approach on energy costs and supplies.

Congratulations.
You've made it to




# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

October 25, 2002

Mr. William J. Snape, III
Vice President
Defenders of Wildlife
1101 Fourteenth Street, NW
Suite 1400
Washington, DC 20005

Dear Mr. Snape:

On September 25, 2002, you, together with Kumar Vaswani, filed a Freedom of Information Act (FOIA) request, asking for the following:

> "1. All financial disclosure reports, including Forms SF 278, filed by J. Steven Griles, Holly Hopkins, or James Cason pursuant to the Ethics in Government Act 1978, as amended, 5 U.S.C. App. § 101 et seq., and 4 C.F.R. Part 2634.
> 2. Any documents relating to the financial interests of Mr. Griles, Ms. Hopkins, or Mr. Cason, including, but not limited to retirement, pension, or investment plans with non-U.S. government entities.
> 3. Any documents relating to ethics agreements (whether oral or written) with J. Steven Griles, Holly Hopkins, or James Cason. This request includes agreements described in 5 U.S.C. App. §110 and 5 C.F.R. § 2634.802 and specifically includes any recusal, divestiture, or resignation agreements themselves, including a correspondence from J. Steven Griles to Wendell Sutton, DOI Human Resources Office, during 2001, in which Mr. Griles agreed to recuse himself regarding matters concerning J. Steven Griles and Associates, National Environmental Strategies, or NES, Inc.;
> 4. All documents relating to contracts, agreements, or communications, including the contracts and agreements themselves, between Mr. Griles and:
>
> a)his former and/or current clients;
> b)J. Steven Griles and Associates;
> c)National Environmental Strategies; and/or
> d)NES, Inc.;
>
> 5.Any documents regarding Mr. Griles, Ms. Hopkins, or Mr. Cason generated pursuant to 5 C.F.R. Parts 2634, 2635, or 2640, including, but not limited to:
>
> a) written disqualification statements pursuant to 5 C.F.R. §2635.402(c),
> b) requests for, and authorizations granting, waivers pursuant to 5 C.F.R. Parts 2635 or 2640, or any other regulation or law regarding personal and business relationships of Federal employees,
> c) any disclosures and any determinations made pursuant to 18 U.S.C. §



Sloca Declaration
Exhibit B

208(b)(l) or 5 C.F.R. § 2635.403(b). ~ 18 U.S.C. § 208(d)(l).
For purposes of this FOIA request, the term "documents" includes but is not limited to correspondence, memos, notes, records, reports, videos, photographs, computer disks, maps, electronic e-mail, and any other applicable or relevant data or information."

Your request was received in the Office of the Secretary FOIA office on September 26, 2002, and was assigned control number 2002-C-402. Please cite this number in any future correspondence or communications with the Department of the Interior regarding your FOIA request.

With respect to your request:

(1) We have classed your request as an "other-use request." This means that we have determined that it is neither a "commercial-use request" nor one placed by a member of the news media or a representative of an educational or non-commercial scientific institution. As an "other-use requester," you are entitled to receive 2 hours of search time and 100 pages of duplication of responsive records without charge before being asked to pay for document search and reproduction. Additionally, the Department of the Interior does not bill requesters for FOIA fees incurred in processing "other-use requests" when their fees do not exceed $15.00, after the subtraction of their entitlements, because the cost of collection would be greater than the fee collected. (CFR 2.20(a)(2)).

(2) However, you have asked for a waiver of all FOIA processing fees. At this point, we have not issued a formal decision on your request for a fee waiver.

We are, nonetheless, proceeding to process your request because it appears that your entitlements may be sufficient to cover the cost of your request. However, if at any point in the processing of your request, it appears likely that the FOIA fee being incurred in its processing will exceed $15.00, we will make a formal determination on your request for a fee waiver. If we decide that your request does not qualify for a fee waiver, we will stop processing your request, immediately, and contact you.[1] At that time we will provide you with our best estimate of the cost of processing your request to completion and ask you if you are willing either to pay the full amount of the FOIA fees incurred, after the subtraction of your entitlements, or to reduce the scope of your request, to an amount below $15.00. If you are unwilling to choose either option, we will be forced to close our file on your request because, under our regulations, (CFR 2.20(g)), an other-use request that does not include a statement that the requester is willing to pay the fees likely

---

[1]In this instance, we would issue a formal written notice of denial and provide you with your appeal rights.

to be incurred in the processing of his/her request may be deemed to have been "not received" by the agency receiving it.

(3) In your request you ask for copies of public financial disclosure reports, enclosing a copy of OGE Form 201. Please be advised that it is not necessary to file a formal FOIA request to obtain a copy of records via OGE Form 201. You may, at any time, submit a copy of this form to the Office of Ethics, at the following address: Office of Ethics, U.S. Department of the Interior, MS 5221 MIB, Washington, DC 20240, and expect to receive a prompt response. With respect to your present request, we are forwarding a copy of your letter, along with the completed OGE Form 201, to the Office of Ethics. The Office of Ethics will respond to you, directly.

(4) Because we will need to consult with other components in the Department, in the processing of your request, the Office of the Secretary FOIA office is taking a 10-working-day time extension, under 43 CFR 2.17(c), on behalf of the Department, in order to properly process your request. Our final response will be sent to you on or before November 8, 2002. We hope, however, to be able to respond to you before this date.

In the interim, if you have any questions regarding the status of your request, you may contact me by phone at 202-208-6045, by fax at 202-219-0813, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Alternatively, you can provide us with a phone number at which you can be reached, along with the time of day that you prefer to be contacted, and we can attempt to contact you, at our expense, to answer any questions that you might have, regarding your request. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

***PRIVACY ACT notice***: *Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us*

*into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act enforcement. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit. Also, e-mail is not necessarily secure against interception. If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

December 6, 2002

Mr. William J. Snape, III
Vice President
Defenders of Wildlife
1101 Fourteenth Street, NW
Suite 1400
Washington, D. C. 20005

Dear Mr. Snape:

This is in further reference to your Freedom of Information Act (FOIA) request of September 25, 2002. In that letter you sought, among other documents, all financial disclosure reports filed by J. Steven Griles, Holly Hopkins, and James Cason pursuant to the Ethics in Government Act of 1978, as amended, and associated regulations.

The Office of the Secretary continues to process your FOIA request. However, at this time we are making available to you the financial disclosure reports (SF 278s), which are available to the public. We call your attention to the statutory and regulatory restrictions on the use of these reports, which are listed in the OGE Form 201 you submitted with your request and in 5 CFR § 2634.603(f).

Please be assured that you will be contacted with regard to the final processing of your FOIA within the next week. In the meantime, if you have questions regarding the status of your request, you may contact me at 202-208-6045, or by fax at 202-219-0813, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D. C. 20240.

Sincerely,

Sue Ellen Sloca
Sue Ellen Sloca
FOIA Officer
Office of the Secretary

Enclosures

Sloca Declaration
Exhibit C



United States Department of the Interior



OFFICE OF THE SECRETARY
Washington, D.C. 20240

January 3, 2003

Mr. William J. Snape, III
Vice President
Defenders of Wildlife
1101 Fourteenth Street, NW
Suite 1400
Washington, DC 20005

Dear Mr. Snape:

This is in further response to Freedom of Information Act (FOIA) request 2002-C-402, asking for the following:

"1. All financial disclosure reports, including Forms SF 278, filed by J. Steven Griles, Holly Hopkins, or James Cason pursuant to the Ethics in Government Act 1978, as amended, 5 U.S.C. App. § 101 et seq., and 4 C.F.R. Part 2634.
2. Any documents relating to the financial interests of Mr. Griles, Ms. Hopkins, or Mr. Cason, including, but not limited to retirement, pension, or investment plans with non-U.S. government entities.
3. Any documents relating to ethics agreements (whether oral or written) with J. Steven Griles, Holly Hopkins, or James Cason. This request includes agreements described in 5 U.S.C. App. §110 and 5 C.F.R. § 2634.802 and specifically includes any recusal, divestiture, or resignation agreements themselves, including a correspondence from J. Steven Griles to Wendell Sutton, DOI Human Resources Office, during 2001, in which Mr. Griles agreed to recuse himself regarding matters concerning J. Steven Griles and Associates, National Environmental Strategies, or NES, Inc.;
4. All documents relating to contracts, agreements, or communications, including the contracts and agreements themselves, between Mr. Griles and:
a)his former and/or current clients;
b)J. Steven Griles and Associates;
c)National Environmental Strategies; and/or
d)NES, Inc.;
5.Any documents regarding Mr. Griles, Ms. Hopkins, or Mr. Cason generated pursuant to 5 C.F.R. Parts 2634, 2635, or 2640, including, but not limited to:
a) written disqualification statements pursuant to 5 C.F.R. §2635.402(c),
b) requests for, and authorizations granting, waivers pursuant to 5 C.F.R. Parts 2635 or 2640, or any other regulation or law regarding personal and business relationships of Federal employees,
c) any disclosures and any determinations made pursuant to 18 U.S.C. § 208(b)(l) or 5 C.F.R. § 2635.403(b). ~ 18 U.S.C. § 208(d)(l).



Sloca Declaration
Exhibit D

For purposes of this FOIA request, the term "documents" includes but is not limited to correspondence, memos, notes, records, reports, videos, photographs, computer disks, maps, electronic e-mail, and any other applicable or relevant data or information."

Enclosed in full is a copy of the Public Financial Disclosure Report for James Steven Griles for the year 2001. It was inadvertently omitted from the package sent by the Ethics Office to the Office of the Secretary FOIA office, for inclusion in our December 6, 2002 response. (13 pages)

As with our release to you of other Public Financial Disclosure Reports, we call your attention to the statutory and regulatory restrictions on the use of these reports, which are listed in the OGE form you submitted with your request and in 5 CFR 2634.603(f).

If you have any questions about this portion of our response to your request, you may contact me by phone at 202-208-6045, by fax at 202-219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1540 MIB, Washington, D.C. 20240.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

Enclosure



# United States Department of the Interior




OFFICE OF THE SECRETARY
Washington, D.C. 20240

January 8, 2003

Mr. William J. Snape, III
Vice President
Defenders of Wildlife
1101 Fourteenth Street, NW
Suite 1400
Washington, D.C. 20005

Dear Mr. Snape:

This is in further response to your Freedom of Information Act (FOIA) request of September 25, 2002 (2002-C-402). In that letter you sought all financial disclosure reports, including Forms SF 278, filed by J. Steven Griles, Holly Hopkins, or James Cason pursuant to the Ethics in Government Act of 1978, as amended, 5 U.S.C. App. § 101 et seq., and 5 C.F.R. Part 2634. We have transmitted these documents under separate cover, dated December 6, 2002.

In addition, your request sought the following documents: (1) any documents relating to the financial interests of Mr. Griles, Ms. Hopkins, or Mr. Cason, including but not limited to retirement, pension, or investment plans with non-U.S. government entities; (2) any documents relating to ethics agreements (whether oral or written) with J. Steven Griles, Holly Hopkins, or James Cason. This request included agreements described in 5 U.S.C. App. § 110 and 5 C.F.R. § 2634.802 and specifically includes any recusal, divestiture, or resignation agreements themselves, including a correspondence from J. Steven Griles to Wendell Sutton, DOI Human Resources Office, during 2001, in which Mr. Griles agreed to recuse himself regarding matters concerning J. Steven Griles and Associates, National Environmental Strategies, or NES, Inc.; (3) all documents relating to contracts, agreements, or communications, including the contracts and agreements themselves, between Mr. Griles and: (a) his former and/or current clients; (b) J. Steven Griles and Associates; (c) National Environmental Strategies; and /or (d) NES, Inc.; (4) any documents regarding Mr. Griles, Ms. Hopkins, or Mr. Cason generated pursuant to 5 C.F.R. Parts 2634, 2645, or 2640, including, but not limited to: (a) written disqualification statements pursuant to 5 C.F.R. § 2635.402(c), (b) requests for, and authorizations granting, waivers pursuant to 5 C.F.R. Parts 2635 or 2640, or any other regulation or law regarding personal and business relationships to Federal employees, (c)



Sloca Declaration
Exhibit E

any disclosures and any determinations made pursuant to 18 U.S.C. § 208(b)(1) or 5 C.F.R. 2635.403(b).

You also requested a waiver of all fees associated with the processing of your FOIA request.

This is a second response to your request, with which we are including responsive, non-exempt records obtained from the Department's Ethics Office, located within the Office of the Assistant Secretary for Policy, Management and Budget. Additional searches were completed within the offices of J. Steven Griles, James Cason, and Holly Hopkins. We also consulted with the Office of Government Ethics regarding the disposition of one document, and will outline below how we have handled this document.

We are enclosing material responsive to your request.

We are referring one document, a letter, consisting of three pages, which was issued by Office of Government Ethics (OGE), to the OGE for a release decision and direct response to you, pursuant to Department of the Interior regulations on the management of the FOIA program within the Department. See Subpart C - Requests for Records under the FOIA, 43 C.F.R. Section 2.22, Fed. Reg. Vol. 67, No. 203, Pages 64530 and 64538. You may expect to hear from this office shortly with respect to the public availability of this document. If you do not, or if you need to contact it sooner, you may write or call William Gressman, Sr. Associate General Counsel, Office of Government Ethics, 1201 New York Avenue, N.W., Suite 500, Washington, D.C. 20005, 202-208-8000.

We are also withholding material responsive to your request pursuant to Exemptions 4, 5, and 6 of the FOIA (5 U.S.C. § 552(b)), as outlined on the attached listing.

We are withholding in its entirety one document under Exemption 4 of the FOIA (5 U.S.C. § 552(b)(4)). This Exemption protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." For this Exemption to apply, the Government must show that the withheld information is: (a) commercial or financial, and (b) obtained from a person, and (c) privileged or confidential. The document being withheld under this Exemption consists of a customer/client list of J. Steven Griles' former employer, National Environmental Strategies (NES), and is therefore commercial or financial information. This document was obtained from NES, a "person" under the FOIA Exemption 4. Lastly, this document is confidential. This information was voluntarily submitted to the Department by NES. In doing so, NES informed the Department that it customarily does not release this information to the public, and requested that the Department protect it. Therefore, the

Department concludes that disclosure of the information contained in this document would both impair the Department's ability to obtain necessary information in the future, and would cause substantial harm to the competitive position of the company who supplied the information. See, Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992) (en banc) (Critical Mass II).

We are withholding other documents under Exemption 5 of the FOIA (5 U.S.C. § 552(b)(5)). Exemption 5 of the FOIA allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party...in litigation with the agency." (5 U.S.C. § 552 (b)(5)). As such, the privilege "exempt[s] those documents...normally privileged in the civil discovery context." National Labor Relations Board v. Sears, Roebuck, & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process.

The deliberative process privilege "protect[s] the decision making process of government agencies" and "encourage[s] the frank discussion of legal and policy issues" by ensuring that agencies are "not forced to operate in a fish bowl." Mapother v. United States Department of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1988) (en banc) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Department of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Department of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both pre-decisional and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Department of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). A "pre-decisional" document is one "prepared in order to assist an agency decision maker in arriving at his decision," and may include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Maricopa Audubon Society v. United States Forest Service, 108 F.3d 1089, 1093 (9th Cir. 1997). A pre-decisional document is part of the "deliberative process" if "the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." Id.

The documents that have been withheld under Exemption 5 are all pre-decisional and deliberative. They contain recommendations, proposals, suggestions, and other subjective documents that reflect the personal opinions of their authors. They do not contain or represent formal or informal agency policies or decisions. Furthermore, they are the result of frank and open discussions among employees of the Department of the Interior. Their content has been held confidential by all parties. Several of the withheld documents are drafts. Drafts are one of the types of documents that are protected from release by the deliberative process privilege. Town of Norfolk v. U.S. Corps of Engineers, 968 F.2d 1438, 1458 (1st Cir. 1992). Release of these drafts could have a direct, adverse effect on the Department's deliberative process by chilling the free flow of opinion that is necessary to develop policy and it could confuse the public by revealing opinions that may not have been adopted by the agency. Public dissemination of this information would most certainly have a chilling effect on the agency's deliberative process. It would expose the agency's decision-making process in such a way as to discourage candid discussion within and without the agency and thereby undermine its ability to perform its mandated functions. We have concluded, therefore, that there are sound reasons for withholding documents under Exemption 5 of the FOIA (5 U.S.C. § 552(b)(5)).

The remaining material being withheld under the deliberative process privilege has been closely examined for the purpose of determining whether factual information may be properly segregated from deliberative information and disclosed. These documents include the Department's response to the letter from OGE previously referenced. The majority of the factual material in these documents was assembled through an exercise in judgment in extracting pertinent material from a large number of documents for the benefit of an official called upon to take discretionary action and therefore falls within the deliberative process privilege. See, Mapother, at 1538-40. The factual material in these documents is so inextricably connected to the deliberative material that its disclosure would expose or cause harm to the agency's deliberations. Some of the documents summarize relevant facts, but the summary is so intertwined with recommendations and opinions that production of redacted versions of the documents would render them incomprehensible. Where it has been possible to disclose factual information segregated from deliberative or privileged information, we have done so.

In addition to being withheld under the deliberative process privilege of Exemption 5, three documents are also being withheld pursuant to the attorney-client privilege. These documents represent facts divulged by a client to his attorney as well as opinions given by an attorney to his client based on and reflecting, those facts. Consequently, these documents are subject to exemption. See, Ludsin v. SBA, No. 96-2865, slip op. at 3 (D.D.C. Apr. 24, 1997). Likewise, these documents reveal communications between

attorneys that reflect client-supplied information. These documents are confidential because the government is dealing with its attorneys as would any private party seeking advice to protect personal interests. Furthermore, the privilege extends to attorney-client communications when the specifics of the communications are confidential even though the underlying subject matter is known to third parties. See, Upjohn Co. v. United States, 449 U.S. 383 (1981).

In addition, a portion of one document is being withheld under the attorney-work-product privilege of Exemption 5. The attorney-work product privilege protects materials prepared by an attorney in contemplation of litigation. Its purpose is to protect the adversarial trial process by insulating the attorney's preparation from scrutiny. The attorney-client privilege protects communications between an attorney and his/her client relating to legal matters for which the client has sought professional advice. It is founded on the principle that "sound legal advice or advocacy serves public ends." *See* Upjohn Co. v. United States 449 U.S. 383, 389 (1981).

The portion of the document that has been withheld pursuant to the attorney-work product privilege was prepared by an agency attorney in contemplation of litigation. Public dissemination of this information would compromise the agency's ability to protect its interests in court.

In addition, we are withholding other material under Exemption 6 of the FOIA (5 U.S.C. § 552(b)(6)). This section permits the government to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." The documents we are withholding under this Exemption include brokerage statements documenting the financial interests of J. Steven Griles, which were used in reviewing and certifying his SF-278, Public Financial Disclosure Statement. The information in these statements are identifiable to J. Steven Griles as a specific individual. He has a strong privacy interest in this information, which reveals monthly fluctuations in the management of his personal financial holdings. On the other hand, there is no legitimate public interest in this information because it does not reveal anything about the operations of government. The SF-278 forms, already disclosed, reveal his financial holdings with ranges in value, sufficient to provide the public with a basis to evaluate how the Department identifies and addresses potential conflicts of interest. The Department must balance the public's right to disclosure against the individual's right to privacy in determining whether the information in these documents meets the threshold requirement of Exemption 6. Weighing the relative public and private interests, we have concluded that to release the information contained in these documents "would constitute a clearly unwarranted invasion of personal privacy." See United States Department of

documents are withheld in their entirety, as segregation of non-exempt information would result in producing documents that are incomprehensible.

Ed Keable, attorney-advisor with the Office of the Solicitor, was consulted in reaching these decisions. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making these decisions.

If you believe that the decision to withhold this information is incorrect, you may file a FOIA appeal by writing to the FOIA Appeals Officer, Office of the Assistant Secretary - Policy, Management and Budget, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 5312, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 20 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter). Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience), and a copy of this letter, along with a brief explanation of why you believe that this decision is in error.

The FOIA fee for processing of your request within the Department of the Interior is $376.16, calculated as follows:

| | |
|---|---|
| 20 hours professional/managerial search time | @ $4.65 per 1/4 hour |
| 32 pages of photocopying | @ $0.13 per page |

However, insofar as we have granted your request for a fee waiver, no bill for collection for this amount is enclosed.

If you have any questions regarding our response to your request, you may contact me by phone at 202-208-6045, by fax at 202-219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Alternatively, you can provide us with a phone number at which you may be reached, along with the time of day that you prefer to be contacted, and we can attempt to contact you, at our expense, to answer any questions that you might have, regarding your request.

Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

Enclosures

***PRIVACY ACT NOTICE:*** *Before you choose to contact us electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act enforcement. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit. Also, e-mail is not necessarily secure against interception. If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

## List of Material Withheld under Exemption 4 of the FOIA

- 1 page consisting of a client/customer list as of October 1, 2002 from National Environmental Strategies – **Withheld in full (Exemption 4).**

## List of Material Withheld under Exemption 5 of the FOIA

- 70 pages of questions/responses regarding J. Steven Griles' financial holdings used to review and certify the original entry on duty SF-278 and current year SF-278 – **Withheld in full (deliberative process).**

- 58 pages of drafts of ethics agreement, recusals, and internal draft memoranda related to J. Steven Griles' ethics agreement (final released) and recusals (finals released) – **Withheld in full (deliberative process).**

- 34 pages of questions/answers regarding Jim Cason's financial holdings used to review and certify the SF-278 – **Withheld in full (deliberative process).**

- 5 pages of questions/answers regarding Holly Hopkins' financial holdings used to review and certify the SF-278 –**Withheld in full (deliberative process).**

- 55 pages of drafts of internal memoranda regarding issues raised by The Washington Post article of May 25, 2002 – **Withheld in full (deliberative process).**

- 1 page memorandum from Shayla Freeman Simmons to J. Steven Griles, discussing letter from the Office of Government Ethics (forwarded to OGE for release decision), dated June 27, 2002 -- **Withheld in full (deliberative process).**

- 4 pages consisting of a transmittal memo and memorandum regarding whether J. Steven Griles should recuse himself in the Cobell litigation – **Withheld in full (attorney-client privilege).**

- 1 page consisting of a transmittal memo from the White House which accompanied a draft SF-278 for J. Steven Griles at the beginning of his confirmation process – **Withheld in full (deliberative process).**

- 84 pages of drafts of response letter to the Office of Government Ethics, plus 4 pages of final letter – **Withheld in full (deliberative process).** Total of 88 pages in this category.

- 1 page consisting of an internal memo to J. Steven Griles from the Ethics Office about participating in a meeting with the Treasury Department on the Cobell litigation – **Withheld in part (attorney-client and attorney-work-product privilege).**

- 1 page consisting of an email that reveals attorney-client privileged communication relating to the Assistant Secretary for Water and Science unrelated and unresponsive to this FOIA request – **Withheld in part (attorney-client privilege).**

## List of Material Withheld under Exemption 6 of the FOIA

- 38 pages of brokerage and account statements of J. Steven Griles used to review and certify the original entry on duty SF- 278 and current year SF-278 – **Withheld in full (Exemption 6).**