

2003-091

February 4, 2003

# FREEDOM OF INFORMATION ACT APPEAL

## VIA HAND DELIVERY

FOIA Appeals Officer
Office of the Assistant Secretary–
 Policy, Management and Budget
U.S. Department of the Interior
1849 C Street, N.W.
Mail Stop 5312, MIB
Washington, D.C. 20240

Re: Freedom of Information Act Appeal–No. 2002-C-402

Dear Appeals Officer:

Defenders of Wildlife ("Defenders"), Friends of the Earth ("FoE"), and the Endangered Species Coalition ("ESC") hereby appeal, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(6), U.S. Department of the Interior Regulations, 43 C.F.R. § 2.28[1], and other appropriate legal authority, the adverse determination (in the form of nonresponses, claimed exemptions and other withholdings) by the U.S. Department of the Interior ("the Department") of the FOIA request by Defenders and FoE. The requested information is in the public interest because of the public's clear and compelling need for information regarding the regulatory integrity of Department officials and conflicts of interest that may affect the management of Department-administered lands.

## BACKGROUND

Defenders and FoE submitted a FOIA request on September 25, 2002 (enclosed) to the Department requesting, inter alia, documents relating to the conduct of various Department officials, including Deputy Secretary J. Steven Griles. In its letter dated, October 25, 2002, the Department stated that it was taking a 10-working-day time extension to process our request. By its letter dated December 6, 2002, the Department transmitted documents that we had requested in item #1 of our FOIA request.

National Headquarters
1101 Fourteenth Street, NW
Suite 1400
Washington, DC 20005
Telephone 202-682-9400
Fax 202-682-1331
www.defenders.org
www.kidsplanet.org

---

[1]The Department of the Interior revised its FOIA regulations, effective November 30, 2002. 67 Fed. Reg. 64527-52 (October 21, 2002). We cite the revised regulations throughout this appeal.

Printed on Recycled Paper

Sloca Declaration
Exhibit F

In its letter dated January 8, 2003 (hereinafter "Department's Response"), postmarked January 16, 2003, and delivered to Defenders' offices on January 21, the Department stated that it was withholding numerous documents in full and withholding some documents partially. The Department's Response was accompanied by a two-page list generally describing the records withheld. The response also stated that it was referring one document to the U.S. Office of Government Ethics for further determination and that we "may expect to hear from this office shortly with respect to the public availability of this document." To date we have not heard from that office.

With the exception of the documents withheld under exemption 6 of the FOIA, 5 U.S.C. § 552(b)(6) ("38 pages of brokerage and account statements of J. Steven Griles," Department's Response at 5-6), Defenders, FoE, and ESC appeal the withholding of all responsive documents withheld, whether in full or in part. We also appeal the withholding of the "letter, consisting of three pages, which was issued by the Office of Government Ethics," which you have referred to that office for a determination. Department's Response at 2. See 5 U.S.C. § 552(a)(6)(A)(i), (a)(6)(B)(i) (requiring a determination within 20 working days and permitting an extension for not more than 10 working days in "unusual circumstances"). Other documents that have been specifically identified in our request letter and communications to the Department have not even been acknowledged by the response.

The basic concept of the FOIA is that federal agency records must be accessible to the public, unless specifically exempt from this requirement. "Disclosure, not secrecy, is the dominant objective of the Act." Department of the Air Force v. Rose, 425 U.S. 352, 361 (1976). Subject to exemptions, the FOIA requires prompt disclosure of material upon a request that "(i) reasonably describes such records and (ii) is made in accordance with published rules." 5 U.S.C. § 552(a)(3)(A). This requirement is echoed in the Department's regulations. 43 C.F.R. § 2.2.

The central problem with the Department's Response is the complete lack of factual context as to why certain documents or portions of documents have been withheld. For starters, the Department has violated the FOIA by failing to provide a list of documents withheld. 5 U.S.C. § 552(a)(6)(A(i). Instead, the Department has provided vague categories of documents withheld, without any specificity as to the subject matter (e.g., "70 pages of questions/responses regarding J. Steven Griles' financial holdings used to review and certify . . ."). See Shermco Industries, Inc. v. Secretary of the Air Force, 452 F. Supp. 306, 317 (N.D. Tex. 1978), rev'd on other grounds, 613 F.2d 1314 (5th Cir. 1980) ("A person cannot effectively appeal a decision about the releasability of documents . . . if he is not informed of at least a list of the documents to which he was denied access . . .").[2]

---

[2] In addition, two documents that the Department provided, a June 28, 2002 e-mail from Shayla Simmons to Arthur Gary, and a July 31, 2002 "Note to Steve Griles File" from Shayla Simmons, have had material redacted under the nomenclature "Exemption 5." Neither of these documents appears on the list of material withheld, nor has the Department provided any justification for the use of a FOIA exemption for the portions of the documents redacted.

2

**RESPONSIVE DOCUMENTS APPEAR TO HAVE BEEN OMITTED**

Our FOIA request sought "documents" (broadly defined) relating to, inter alia, contracts, agreements, or communications, including the contracts and agreements themselves, between Mr. Griles and a) his former and/or current clients; b) J. Steven Griles and Associates; c) National Environmental Strategies; and/or d) NES, Inc.  The Department has not provided these to us.  In addition, the list of material withheld does not include these documents.  We know that at least one such agreement exists because it is disclosed in Mr. Griles Public Financial Disclosure Report (SF 278) that he filed on April 24, 2001, so we find it disturbing that the Department does not even acknowledge the fact that it possesses these responsive documents, particularly given that much of the controversy surrounding Mr. Griles's activities stems from these agreements.  Substantial media coverage has also focused on Mr. Griles's financial arrangement with his former firms and clients.  See Eric Pianin, "Official's Lobbying Ties Decried," The Washington Post, September 25, 2002, p. A1; Sasha Polakow-Suransky, "The West's Griles Virus: Industry's Man in Interior," The American Prospect, September 9, 2002; Michael Grunwald, "Interior Official's Memo Raises Conflict Issue," The Washington Post, May 25, 2002, p. A2.  The Department itself knows that Mr. Griles's agreement(s) were a source of controversy.  See Department's list of material withheld ("55 pages of drafts of internal memoranda regarding issues raised by the Washington Post article of May 25, 2002").  The following is an additional sample of documents that the Department has failed to provide or include in its list of withheld documents:

- Our FOIA request sought any documents regarding Mr. Griles generated pursuant to 5 C.F.R. Parts 2634, 2635, or 2640, including "requests for, and authorizations granting, waivers pursuant to 5 C.F.R. § Parts 2635 or 2640, or any other regulation or law regarding personal and business relationships of Federal employees," as well as "any disclosures and any determinations made pursuant to 18 U.S.C. § 208(b)(1) or 5 C.F.R. § 2635.403(b)."  We find it hard to believe that the Department lacks any such documents, particularly since the Washington Post reported that Mr. Griles stated he "obtained approval for his scheduled meetings from the Interior Department's ethics lawyer" before meeting with former clients.  Eric Pianin, "Official's Lobbying Ties Decried," The Washington Post, September 25, 2002, p. A1.

- The July 31, 2002, "Note to Steve Griles File" from Shayla Simmons and the July 26, 2002, "Note to Steve Griles" from Shayla Simmons refer to Mr. Griles's recusal from issues related to the Cobell settlement negotiations.  The Department has not provided any recusal agreements relating to this, nor do these agreements appear in the list of materials withheld.

- The July 11, 2002, e-mail from Arthur Gary refers to a "definitive ruling" that Mr. Griles's assistant Holly Hopkins requested regarding the propriety of Mr. Griles meeting with former clients of NES.  Mr. Gary states that "we were not prepared to give the answer today, but would consult with SOL and give the word SOON" (emphasis in

original). No such ruling has been included in the documents provided or in the list of material withheld.

• the May 11, 2001 letter from Mr. Griles to Ms. Amy Comstock refers to an "amendment," which the Department has not provided to us or included in the list of withheld documents.

## THE DEPARTMENT HAS NOT RESPONDED TO KEY PORTIONS OF OUR REQUEST.

The Department has failed not only to provide a list of responsive documents as part of the determination required by the FOIA, 5 U.S.C. § 552(A)(6)(A)(i), but has also failed to even fully address some of the records in our request. Our request for "contracts, agreements, or communications, including the contracts and agreements themselves, between Mr. Griles and a) his former and/or current clients; b) J. Steven Griles and Associates; c) National Environmental Strategies; and/or d) NES, Inc." was highly specific, reasonably described the records sought, and fully complied with the Department's rules for FOIA requests. 5 U.S.C. § 552(a)(3)(A). The FOIA requires the Department to address this portion of our request, disclose the records, or explain why it is withholding them. See, 5 U.S.C. § 552(a)(6)(A)(i), (ii) (requiring a determination within strict time limits as to releasability of records requested); id. at § 552(a)(3)(A) (requiring agency to "make the records promptly available to any person"); id. at § 552(b)(1)-(9) (specifying limited exemptions for disclosure). For the Department to fail to satisfy its legal mandate is a gross violation of the FOIA and entitles us to seek judicial review, in order to have a court "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B).

Relatedly, in withholding documents en mass, the Department has ignored the purpose of our original FOIA request. We do not seek information the disclosure of which would violate personal privacy, trade secrets, or other legitimate, protected interests per se for which the FOIA provides exemptions. We seek documents that elucidate potential conflicts of interest, for which disclosure is clearly in the public interest. The financial and other agreement(s) Mr. Griles has with his former firms are clearly responsive to this purpose, and we are willing to accept, at least initially, the redaction of personal or confidential commercial information, such as client names, consistent with the FOIA, before disclosure, as long as the documents demonstrate the overall structure of Mr. Griles's arrangement with his former firms.

## THE DEPARTMENT'S CLAIMED EXEMPTIONS AND PRIVILEGES ARE HIGHLY SUSPECT.

The claimed exemption for "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential" (5 U.S.C. § 552(b)(4))

Defenders disputes that certain documents withheld fall within FOIA's exemption 4. A

record is considered confidential according to this exemption if disclosure is likely to have either of the following effects: 1) to impair the government's ability to obtain the necessary information in the future or 2) to cause substantial harm to the competitive position of the person from whom the information was obtained. See generally National Parks and Conservation Association v. Morton, 498 F.2d 765 (D.C. Cir. 1974). To demonstrate "impairment," the agency must provide a detailed justification of the extent to which disclosure will impair the government's ability to obtain necessary information, supported by specific factual or evidentiary material. Pacific Architects and Engineers v. Renegotiation Board, 505 F.2d 383, 385 (D.C. Cir. 1987). A minor impairment cannot overcome the FOIA's disclosure requirement. The impairment must be significant enough to justify withholding the information. Washington Post Co. v. United States Dept. of Health & Human Services, 690 F.2d 252, 269 (D.C. Cir. 1982). The Department's Response lacks any indication of the circumstances under which it received the information or that release of the information will impair its ability to obtain this information.

Where the submitter has voluntarily provided the information to the Government, it is exempt if the submitter can show that the information is not customarily released to the public. Critical Mass Energy Project v. NRC, 975 F.2d 871, 879-80 (D.C. Cir. 1992)(en banc). Here, however, the Department has failed to demonstrate that this information is not customarily released to the public. Likewise, the Department has failed to demonstrate that the release of the information will cause substantial competitive harm to the submitter. Again, the Department should consider redacting truly confidential information, 5 U.S.C. § 552(b), in order to provide documents that elucidate potential conflicts of interest, for which disclosure is clearly in the public interest.

## The claimed exemption for "deliberative process" (5 U.S.C. § 552(b)(5))

The Department claims that several documents withheld in full (totaling more than 300 pages) fall within FOIA exemption 5 for deliberative process, 5 U.S.C. § 552(b)(5). We repeat our concern that the denial letter fails to provide sufficient information to determine the legitimacy of the use of this exemption. In addition, since the Department has failed to describe these documents other than in the broadest terms, we are placed in the position of appealing a decision when no legal rationale has been provided for final agency decisions that were obviously made.

The Department has failed to comply with the FOIA's mandate that "disclosure, not secrecy, is the dominant objective of the Act." Department of the Air Force v. Rose, 425 U.S. 352, 361 (1976). The ultimate purpose of Exemption 5, in the context of the deliberative process that the Department claims, is to prevent injury to the quality of agency decisions. NLRB v. Sears, Roebuck, 421 U.S. 132, 151 (1975). In particular, it is intended, inter alia, to encourage open, frank discussions on policy matters between subordinate and chief, to protect against premature disclosure of proposed policies before they are finally adopted, and to protect against public confusion by disclosure of reasons and rationales that were not in fact the actual reasons for the agency's actions. Coastal States Gas Corp. v. DOE, 617 F.2d 854, 866 (D.C. Cir. 1980).

In this regard, we have no intent to intrude upon the legitimate deliberative processes of the Department. Consistent with the purpose of our original request, we are merely seeking documents evincing the final agency conclusion as to whether or not Mr. Griles has a conflict of interest, along with the final analysis explaining that conclusion and reasonably segregable material. See, e.g., Vaughn v. Rosen (II), 383 F. Supp. 1049, 1053 (D.D.C. 1974), aff'd, 523 F.2d 1136 (D.C. Cir. 1975) (holding Exemption 5 inapplicable to "factual, investigative, and evaluative portions" of documents which "reflect final objective analyses of agency performance under existing policy" and "reveal whether the agencies' policies are being carried out"). See also, 5 U.S.C. § 552(b) (requiring disclosure of "any reasonably segregable portion of a record").

To fall within Exemption 5, two requirements must be met. First, the document must be prepared prior to a final decision in order to assist an agency decisionmaker in arriving at his decision. Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975). Second, a document must be a direct part of the deliberative process in that it makes recommendations or opinions on legal or policy matters to be decided by the agency Vaughn v. Rosen (II), 523 F.2d 1136, 1444 (D.C. Cir. 1975). The government must carry its burden of establishing the existence of a genuine predecisional process. Id. Post-decisional documents are not protected by exemption 5. NLRB, 421 U.S. at 151-52. Furthermore, factual information that may be segregated from the rest of the document is not protected by the privilege. Ryan v. DOJ, 617 F.2d 781, 790-91 (D.C. Cir. 1980). See also, 5 U.S.C. § 552(b). The Department has failed to meet its burden of demonstrating that Exemption 5 applies. For instance, the "70 pages of questions/responses regarding J. Steven Griles' financial holdings," on their face, contain no recommendations or opinions. Similarly, the Department has failed to explain how a "one-page memorandum from Shayla Freeman Simmons to J. Steven Griles discussing letter from the Office of Government Ethics" was prepared prior to a final decision in order to assist an agency decisionmaker in arriving at his decision. Moreover, the Department has not explained the administrative process(es) for which it claims the exemption and the role of the withheld documents in that process, as required by the Supreme Court. Renegotiation Board., 421 U.S. at 172-79. The Department has also failed to explain how the decisions at issue are reached or provided the necessary information to establish the applicability of the deliberative process exemption. SafeCard Services, Inc. v. SEC, 926 F. 2d 1197, 1204-05 (D.C. Cir.1991).

The Department's recitation of Town of Norfolk v. U.S. Corps of Engineers, 968 F.2d 1438, 1458 (1st Cir. 1992) to exclude scores of pages of drafts is misplaced. In that case, in which non-disclosure was permitted, the court stated, "The draft letter has no factual information and it reflects a preliminary position by the Corps that was subsequently rejected." Id. at 1458. Here, the withheld documents likely contain a great deal of factual information, and some of this information must have reflected final positions taken by the Department.

Finally, through its blanket application of Exemption 5 to more than 300 pages of documents, the Department has failed to heed the Supreme Court's distinction between "materials reflecting deliberative or policy-making process on the one hand, and purely factual, investigative matters on the other." EPA v. Mink, 410 U.S. 73, 89 (1973). Even if a document is

"predecisional," "the privilege applies only to the 'opinion' or 'recommendatory' portion of [a document], not to factual information which is contained in the document." Coastal States Gas Corp., 617 F.2d at 867 See also, 5 U.S.C. § 552(b) (requiring release of "any reasonably segregable portion of a record" requested).  Also, the Department has failed to explain how a final letter ("response letter to the Office of Government Ethics") is part of the predecisional process.

The Department's almost boilerplate  application of the rule in Mapother v. DOJ, 3 F.3d 1533 (D.C. Cir. 1993), to "the remaining material" is similarly flawed.  In Mapother , the court allowed the agency to withhold factual material assembled through discretionary selection from a large number of primary documents. Id. at 1539.  However, here the Department has failed to demonstrate that the material was produced for the benefit of an official called upon to take discretionary action, as in Mapother. Id.[3]  In fact, the Mapother court actually ordered the release of documents held to be purely factual and not possessing a significant relationship to the Justice Department's deliberations. Id. at 1540.

> The claimed exemption for "attorney-client" and "attorney-work-product privilege" (5 U.S.C. § 552(b)(5))

The Department has withheld three documents, claiming the attorney-client and/or attorney-work-product privilege.[4]  The attorney-client privilege protects confidential communications, including facts, from a client to an attorney, and from an attorney to a client, if the communication is based on confidential information provided by the client. Schlefer v. United States, 702 F.2d 233, 245 (D.C. Cir. 1983).  In the FOIA context, the attorney-client privilege protects an agency's communications with its attorneys, provided that the communications are necessary to obtain informed legal advice and their disclosure is limited to those who are authorized to speak or act for the agency. Coastal States Gas Corp. v. DOE, 617 F.2d at 862-64, citing Mead Data Central, Inc. v. United States Department of the Air Force, 566 F.2d 242, 254 (D.C. Cir. 1977).[5]  For none of the three documents that the Department is

---

[3] Significantly, the Department also fails to describe "the large number of documents" from which the information was drawn, or explain why those primary documents themselves were not released to us.  Department's Response at 4.  Those primary documents are seemingly responsive to our FOIA request.

[4] The Department has also withheld all three documents in full, claiming the the FOIA's deliberative process exemption under 5 U.S.C. § 552(b)(5). As discussed, supra, the Department's invocation of the deliberative process exemption is flawed.

[5] "The distinction between the [attorney-client privilege and the "deliberative process" exemption] is that the attorney-client privilege permits nondisclosure of an attorney's opinion or advice in order to protect the secrecy of the underlying facts, while the deliberative process privilege directly protects advice and opinions and does not permit the nondisclosure of

7

claiming this privilege does the Department articulate (other than in the most general terms) who made the communication, who received it, whether the communication was based on confidential information provided by the agency, whether the communications were with a private or federal attorney, and whether the disclosure was limited to those who are authorized to speak or act for the agency.

The attorney-work-product privilege protects documents prepared by an attorney "in contemplation of litigation which set forth the attorney's theory of the case and his litigation strategy." NLRB, 421 U.S. at 154. The Department's Response merely states that this document was "prepared by an agency attorney in contemplation of litigation." Department's Response at 5. However, the Department fails to explain how a memo from the Ethics Office regarding the propriety of Mr. Griles's participation in a meeting regarding the Cobell litigation "sets forth the attorney's theory of the case and litigation strategy" in the Cobell case. NLRB 421 U.S. at 154. In sum, the Department has not demonstrated that the documents withheld fall within the FOIA's Exemption 5 for either attorney-client privilege or attorney-work-product privilege.

Nonetheless, we are not seeking to violate either of the privileges under which the Department has withheld these three documents. For two of these documents ("4 pages consisting of a transmittal memo and memorandum regarding whether J. Steven Griles should recuse himself in the Cobell litigation" and "1 page consisting of an internal memo to J. Steven Griles from the Ethics Office about participating in a meeting with the Treasury Department on the Cobell litigation"), we are not seeking disclosure except to the extent that they are responsive to the purpose of our original request–namely documents that elucidate potential conflicts of interest, for which disclosure is clearly in the public interest, as well as an explanation of the structure of Mr. Griles's arrangement with his former firms.

The third document is "1 page consisting of an e-mail that reveals attorney-client privileged communication relating to the Assistant Secretary for Water and Science." The Department has concluded that this document is "unrelated and unresponsive to this FOIA." We are not seeking unrelated and unresponsive documents. If the Department's description of this document is accurate (and we lack sufficient information to say that it is) then the Department need not have identified the document in the first place.[6]

---

underlying facts unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process." Schlefer, 702 F.2d at 245 n. 26, citing Mead Data, 566 F.2d at 254 n.28.

[6] However, this may be an appropriate document to be included in a Vaughn index. See Vaughn v. Rosen (I), 484 F.2d 820 (D.C. Cir. 1973), cert denied, 415 U.S. 977 (1974).

**CONCLUSION**

The courts have consistently upheld the FOIA's intent to facilitate maximum disclosure of government records. "[E]xemptions from disclosure must be construed narrowly, in such a way as to provide maximum access consonant with the overall purpose of the [FOIA]." Vaughn v. Rosen (I), 484 F.2d at 823. The Department's refusal to disclose the information requested violates the spirit and letter of the FOIA, and significantly harms the public interest.

Thank you for your prompt attention to this matter. As provided by the FOIA and Department regulations, we expect a reply to this request within twenty business days of receipt. 5 U.S.C. § 552(a)(6)(A)(ii), 43 C.F.R. § 2.32(a). Please do not hesitate to call us if we can be of further assistance. We look forward to your reply and hope we can resolve this matter amicably and expeditiously.

Sincerely,

William J. Snape, III
Vice President and Chief Counsel

Kumar Vaswani
Staff Attorney

Enclosures:    Original FOIA request
               Department of Interior response
               Eric Pianin, "Official's Lobbying Ties Decried,"
                    The Washington Post, September 25, 2002
               Sasha Polakow-Suransky, "The West's Griles Virus:
                    Industry's Man in Interior," The American Prospect,
                    September 9, 2002
               Michael Grunwald, "Interior Official's Memo Raises
                    Conflict Issue," The Washington Post, May 25, 2002

cc: Kristen Sykes, Friends of the Earth
    Brock Evans, Endangered Species Coalition

9

*Wash Post, 9-25-02, p.A1*

# Official's Lobbying Ties Decried

## Interior's Griles Defends Meetings as Social, Informational

By Eric Pianin
*Washington Post Staff Writer*

When several senators voiced concern in May 2001 that his extensive lobbying ties might conflict with his new job as deputy interior secretary, J. Steven Griles insisted it wouldn't be a problem.

"I will do my utmost . . . to prevent the appearance of any improprieties or conflicts in terms of my prior associations," Griles told the Senate Energy and Natural Resources Committee during his confirmation hearing. He signed two letters pledging to recuse himself for up to six years from matters that could affect his former lobbying firm or the array of utilities, mining companies and other energy producers he represented.

Within weeks of taking office, Griles began a series of meetings with former clients and administration officials on regulatory matters important to several of his former clients.

Griles, 54, says he has violated neither his pledge to the senators nor federal guidelines meant to curb conflicts of interest. Some environmental groups disagree, however, and a U.S. senator has called for an investigation.

A review of Griles's activities shows that he has met frequently with some of the energy industry leaders he once represented. For example, he met at least three times with Harold P. Quinn Jr. and other senior officials of the National Mining Association between Aug. 16, 2001, and Jan. 8, while the industry group—a former client—was lobbying the administration to loosen standards

*See GRILES, A10, Col. 1*



BY DAVID GRUBBS—BILLINGS GAZETTE VIA ASSOCIATED PRESS

**Deputy Interior Secretary J. Steven Griles says he has not violated guidelines meant to curb conflicts of interest. Some critics disagree.**

# Interior's Griles Defends Meetings

**GRILES,** *From A1*

for mountaintop mining operations and preserve a hardrock mining law highly favorable to the industry.

He also took part in a meeting on Sept. 10, 2001, with a dozen top executives of another former client, the Edison Electric Institute, to discuss Bush administration plans to relax clean-air enforcement actions against aging coal-fired power plants but to seek tough new industry-wide standards for emissions of sulfur dioxide, nitrogen oxide and mercury. Accounts of the meetings come from Washington Post interviews and official government logs obtained by two environmental groups, Friends of the Earth and the Citizens Coal Council.

Federal ethics statutes and regulations are open to wide interpretation. Generally, however, they prohibit a government official from knowingly participating "personally and substantially" in any "particular matter" that could affect his or her own financial interests or that involves a former employer or client of that employer. The stated intent is to avoid a situation in which "a reasonable person" familiar with relevant facts would question the official's impartiality.

In a recent interview, Griles said his meetings with former clients were largely social or informational in nature, and that he never took part in administration deliberations over "any particular matter" that might directly affect his former lobbying firm or clients. When in doubt, he said, he obtained approval for his scheduled meetings from the Interior Department's ethics lawyer to avoid the possibility of a conflict of interest. More than once, he said, he backed out of meetings when it appeared he would be discussing matters of direct interest to former clients."We are all as scrupulous as we can be to assure that I will not be involved in any particular matter that would violate the ethics agreement or even have the appearance of a conflict of interest," Griles said. "The president said he wanted this administration to be held to the highest ethical standards, and I don't want it ever to be said that I didn't."

## Maintaining Contacts

As the Interior Department's No. 2 official, Griles is responsible for managing the government's vast mineral and land holdings as well as conferring with other departments and the White House on a broad range of energy-related is-

sues with substantial environmental consequences and financial implications for the energy industry.

While maintaining contacts with former clients and industry associates, Griles had at least 32 meetings with executive branch officials on pending mining and clean-air regulatory matters that were of concern to several of his former clients. Those meetings occurred between July 27, 2001, and Feb. 20, according to the logs.

Griles's critics say he flouted his recusal agreements and government conflict-of-interest rules by repeatedly involving himself in issues with significant economic consequences for his former industry clients.

"The biggest thing is that Mr. Griles said he wouldn't be involved in any particular matter that impacts his previous clients and employer, and he clearly was involved in discussions about rule-making that have weakened environmental laws and have had positive impacts on his previous clients," said Kristen Sykes, a researcher for Friends of the Earth.

Carolyn Johnson, staff director of the Citizens Coal Council, said Griles "just didn't hold back at all."

Sen. Ron Wyden (D-Ore.), one of four energy committee members who voted against Griles's nomination, said last week that the Interior Department's inspector general should investigate Griles's conduct to determine whether he directly or indirectly helped his former lobbying firm and clients, as some are alleging. "I think that it's critical to get to the bottom of this situation and not have the public wondering if powerful special interests get dealt a winning hand, with Mr. Griles doing the dealing," Wyden said.

Griles maintains a financial link to one of his former Washington lobbying firms, National Environmental Strategies. It was founded in 1990 by Marc Himmelstein and Haley Barbour, before Barbour became chairman of the Republican National Committee. As a condition of his July 12, 2001, Senate

confirmation, Griles sold his interest to Himmelstein and closed another firm called J. Steven Griles & Associates.

Under the sales agreement, Himmelstein's firm is paying Griles $284,000 annually for four years. Griles began receiving installments on the roughly $1.1 million purchase agreement last year, on top of his $150,000 annual government salary.

Griles pledged in one of his recusal letters to take no action that would affect his former firm's "ability or willingness" to continue making the payments. Last week, he defended the arrangement as a reasonable business transaction that would not leave Himmelstein's lobbying firm strapped for cash. Himmelstein said recently that, since Griles moved to Interior, the two men have continued to socialize, occasionally getting together for a beer or dinner, but that "We don't talk about work. We're not allowed."

## Barred From Certain Issues

The Bush administration has recruited scores of corporate executives and industry lobbyists to serve in key regulatory posts, particularly at the Energy Department, the Environmental Protection Agency and Interior. Many of these officials are barred by law and administrative policies from handling certain issues for a year or more because of the potential for conflicts of interest involving former employers.

Interior Secretary Gale A. Norton, a Colorado lawyer and onetime advocate for western property interests, and at least 10 other high-ranking Interior officials have recused themselves from certain government activities that might affect their former employers, clients, or



# LEARN TO DANCE

**YOUR FIRST LESSON IS FREE!**

PRIVATE &
GROUP LESSONS

with Personal
Dance Trainers

• Swing
• Ballroom
• Fox Trot

# With Former Clients

ton never formally proposed legislation to revise the mining law.

industry-backed foundations, according to department documents.

Griles, a mid-level Interior official in the Reagan administration and onetime Virginia coal company vice president, has generated concern among environmentalists and some lawmakers because of his extensive industry ties and his reputation for aggressively pushing to loosen environmental restrictions to open more public land to drilling and mining. The Washington Post reported earlier this year that Griles had intervened in a dispute over a massive coal methane gas extraction project involving energy companies he once represented. Griles wrote a memorandum challenging an EPA report critical of the country's largest domestic energy exploration project, in Wyoming's Powder River Basin.

The Interior Department's lawyers concluded in April that Griles's memo did not violate ethics rules or his recusal agreement. Griles said he subsequently signed another agreement, on May 8, specifically disqualifying himself from coal-bed methane issues "for the world to know I'm not even going to be talking to anybody about it again."

The Interior Department logs cite several meetings between Griles and Quinn, the National Mining Association's senior vice president. The two men had lunch on Aug. 16, 2001, and then met again on Nov. 29. A spokesman for Quinn described the lunch as a "social gathering," and said Quinn couldn't recall the second meeting's purpose.

The National Mining Association was concerned at the time about the administration's deliberations over a proposed rule change to make it easier for mining companies to dump dirt and rock waste from mountaintop mining opera-

tions into adjoining valleys and streams—a move strongly supported by the group. The rule change—which eventually was approved by the EPA and the Army Corps of Engineers April but then blocked by a federal court ruling—would have provided a major boost to low-sulfur coal mining operations in West Virginia and Kentucky and would have stepped up hardrock mining in western states.

According to an Interior department routing slip, Quinn sent Norton a "courtesy copy" of his analysis of the draft rule changes on Dec. 3, 2001, highlighting his group's concerns and criticisms and recommending deletions. Quinn says he never sent the memo. Griles said that he may have discussed mountaintop mining with Quinn in passing, but that he doesn't recall any substantive discussions or Quinn's memo.

On Jan. 8, Quinn visited Griles again, accompanied by mining association president Jack Gerard and four other officials. This meeting was for "a more general discussion of the outlook for mining reform," according to Carol Raulston of the National Mining Association, who attended the 7 a.m. session.

Mining association officials were alarmed by a letter Norton had sent to Congress in October 2001 saying she would support changes in an 1872 law governing hardrock mining on federal lands that likely would add to industry's costs and impose new federal management constraints. "We were there to discuss where that effort was headed from the industry perspective," said Raulston.

Griles said that at most he briefed the mining executives on where the deliberations stood, but that he referred them to another Interior official to talk specifics. Nor-

## Policy Deliberations

Griles has also been involved in deliberations over clean-air enforcement policy and initiatives, a topic handled primarily by the EPA and the Energy Department. According to his calendar, Griles attended at least 16 meetings with other administration officials or industry groups or advocates to discuss air pollution issues. One of those sessions, on Oct. 5, 2001, included White House political adviser Karl Rove, according to the logs.

On Aug. 30, 2001, Griles was briefed on air pollution issues by the Electric Power Research Institute, an industry group represented by Himmelstein. On Sept. 10, Griles attended a meeting organized by James Connaughton, the White House environmental adviser, with 12 utility executives who belong to the Edison Electric Institute, another former Griles client.

Dan Riedinger, a spokesman for the institute, said the officials discussed two matters of major concern to the utility industry: One was the administration's progress in rewriting "New Source Review" rules to reduce the number of government suits brought against older coal-fired power plants for violations of the Clean Air Act, a move heartily endorsed by the industry. The other was an administration proposal dubbed "Clear Skies," intended to sharply reduce industry-wide emissions of sulfur dioxide, nitrogen oxide and mercury, which can cause serious health problems.

Officials of the Edison Electric Institute were troubled by aspects of "Clear Skies" and provided Connaughton, Griles and others with computer analyses highlighting the potential adverse affects of such an approach on energy costs and supplies.

# Congratulations.
# You've made it to

# THE AMERICAN PROSPECT

The West's Griles Virus:
Industry's man in Interior
By Sasha Polakow-Suransky
The American Prospect: Issue Date: 9.9.02

Print Friendly | Email Article

"This hopefully will be a breath of fresh air," exclaimed National
Mining Association spokesman John Grasser, with no intended irony,
after he learned that J. Steven Griles had been nominated as the
Department of the Interior's deputy secretary. Griles, who epitomizes
the revolving door between government and industry, has alternated

William Snape                  -- 1 --              Wed, 14 Aug 2002 15:59:31

between getting rich working for industry and serving at high-level government posts, where he has devised industry-friendly policies to open public lands to drilling and mining.

During the Reagan years, Griles presided over the gutting of the Interior Department's Office of Surface Mining. He was accused of suppressing U.S. Fish and Wildlife Service reports revealing the environmental hazards of offshore drilling in California in order to speed lease sales. And on his way out in 1988, he gave a "farewell gift" to big coal, reducing royalty rates just before taking a job in the industry.

Between his government stints, Griles served as a vice president for the mining giant United Co. and worked as a lobbyist for leading oil, gas and mining companies.

During his 2001 Senate confirmation hearings, Griles attempted to show genuine remorse for his activities during the Reagan years, insisting to a skeptical Sen. Ron Wyden (D-Ore.) that he had grown "older, and perhaps wiser," and "learned that through listening and bringing people together better solutions can occur." But Griles' recent activities offer precious little evidence that he has changed.

Beneath the rolling ranches of central Wyoming's Powder River Basin, lies a rich source of clean-burning natural gas known as coal-bed methane; it's arguably the equivalent of more than a year's gas supply for the entire country. While the federal government owns only 10 percent of the basin's surface land, it owns 63 percent of rights to the area's underground minerals. But most ranchers living above coal-bed methane deposits first learned of their property's subterranean riches when industry representatives knocked on their doors. The Interior Department had already sold the underground mineral leases to the oil and gas companies; only the details of surface damage could be negotiated. And with 51,000 wells slated to be drilled in Wyoming over 10 years, the damages on the surface will amount to more than just a blemish: 17,000 miles of mostly dirt and gravel roads, 20,000 miles of new pipeline, and close to 5,000 containment pits for the more than 1 trillion gallons of non-irrigable water pumped from underground.

The master industry strategist of this project was one J. Steven Griles. From 1998 to 2001, Griles worked as a lobbyist for National

Environmental Strategies (National), a firm founded by former
Republican National Committee Chairman Haley Barbour. Griles also
lobbied for NES Inc. and his own firm, J. Steven Griles and
Associates, during which time he represented the Coalbed Methane Ad
Hoc Committee, as well as Western Gas Resources, Devon Energy and
Redstone, all major players standing to benefit from drilling in the
Powder River Basin. After his appointment at the Interior Department,
Griles sold his client base to colleagues at National and NES Inc. in
exchange for an annual paycheck of $284,000 over a period of four
years. In a letter Griles sent to the Interior Department's
human-resources office in April 2001, three months prior to his
appointment, he pledged to recuse himself for "the duration of this
continuing financial interest," and "for two years after the final
payment is received" from any matters that might affect National and
NES Inc.'s abilities to make their annual payments (or any matters
involving the two firms or their clients).

But by August 2001, Griles had reduced the recusal period to just one
year. That recusal lapsed earlier this month, and Griles is now
technically free to supervise matters involving National and NES Inc.,
which continue to represent the major players in coal-bed methane
development. To Griles, the $284,000 annual compensation is "book
value" for "the value of the client base I have built." To critics,
it's a blatant conflict of interest.

Kristin Sykes of Friends of the Earth says of Griles: "He's so
embroiled. He worked for the Coalbed Methane Ad Hoc Committee, then he
goes to Interior and greases the skids. He's been working on it from
start to finish and just happens to be finishing it up while he's in
the public sector."

Griles' behavior has even drawn the ire of conservatives, including
Tom Fitton of the right-wing Judicial Watch, known for hounding
President Clinton in the Monica Lewinsky case. "He's receiving money
from a company whose finances are dependent on decisions he's making,"
Fitton says of Griles. "They've put what many believe are needed
energy reforms in jeopardy because of appearances of impropriety." As
of press time, the Department of the Interior had not responded to any
of the Prospect's questions regarding the appearance of impropriety.

Griles' conflict of interest came into even sharper relief this April,
when he intervened after learning that the Environmental Protection

Agency planned to reject an industry-friendly environmental-impact statement on the Powder River Basin. The draft statement was prepared by Greystone Environmental Consultants, a private firm. Incidentally, Greystone had been recommended to the Interior Department in June 2000 by Western Gas Resources, a client of Griles' at the time. Griles sent a memo to Linda Fisher, the EPA's second-in-command, urging her not to release an evaluation that "will create, at best, misimpressions and possibly impede the ability to move forward in a constructive manner."

This episode led to another spate of outcries from the environmental community. Griles eventually signed a second recusal on May 8 disqualifying himself from any further matters related to these impact statements. But in the eyes of ethics watchdogs, the damage had been done.

Bill Allison, of the nonpartisan Center for Public Integrity, finds the multiple recusals almost comical. "For a person who becomes a federal official, it's not up to him to jump in and out when he wants," Allison says. "You can't recuse yourself except when you feel like weighing in on an issue." And if the recusal is genuinely observed, wonders Allison, then what's the point of appointing someone with so many strong ties to industry to a largely regulatory office? "Why do you want him there if he can't do the job he's there to do?" Allison asks.

And despite the two recusals, it appears that Griles continues to run the show. According to an Interior Department official who wishes to remain anonymous, "Nothing happens here without Griles' signature. He's the secretary of the Interior. I don't know what [Secretary] Gale Norton does all day."

The pattern echoes Griles' earlier career. In 1988, when the Department of the Interior's Fish and Wildlife Service criticized California offshore-drilling lease sales, Griles attacked its comments, saying "[This] is part of the public record and could prove very damaging to this lease sale." In a press conference in April 1989, soon after the Exxon Valdez oil spill, Rep. Mel Levine (D-Calif.) pointed to a Griles memo as "the 'smoking gun' of an agency whitewash." Rep. Leon Panetta (D-Calif.) accused Griles and company of "trying to 'slam-dunk' oil drilling off the California coast without paying attention to its consequences." Despite Griles' assertions to the contrary, the latest EPA episode reveals that little has changed.

---

William Snape                     -- 4 --                Wed, 14 Aug 2002 15:59:31

Griles' dubious judgment is not limited to the environment. As the Interior Department's deputy secretary, he's also responsible for the Bureau of Indian Affairs, which is currently being sued by 300,000 American Indians in a dispute over mismanagement of federally administered trust accounts dating back to 1887. If victorious, the plaintiffs could collectively receive close to $10 billion. In November 2001, Griles filed an affidavit confirming that he was the Interior Department official responsible for trust reform. Ongoing failure to account for missing trust money has left Norton and Griles facing contempt charges in the ongoing Cobell v. Norton lawsuit.

The Interior Department's bungling of the case became more evident on July 30, when its special trustee for American Indians, Thomas Slonaker, resigned. Slonaker claims he was forced out, and sources close to the case say Griles and White House counsel Kyle Samson barred Slonaker from telling the Senate Indian Affairs Committee that the Interior Department was unable to live up to its trust responsibility because documents had been destroyed. When Slonaker, in response to a question, nonetheless told the committee the real story, he was gone from the Interior Department within days. An angry Sen. McCain (R-Ariz.) has promised a congressional investigation of Slonaker's so-called resignation.

Griles exemplifies an administration in which high-level appointees move seamlessly from lobbying firms and big corporations into roles where they are charged with regulating the industries from which they came. Despite a 1990 executive order -- which prohibited government employees from accepting "any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the employee's agency" -- Griles takes in $284,000 per year from his old lobbying firms. They, meanwhile, continue to represent companies (many of them former Griles clients) that are seeking action from, doing business with and are regulated by the Department of the Interior.

Meanwhile, in the Powder River Basin, massive coal-bed methane development is all but certain. Ranchers and environmentalists managed a small victory this year when Interior's Board of Land Appeals upheld their protest against lease sales based on an environmental-impact statement issued before coal-bed methane was even on the map. But the board may not have the final word.

---

William Snape                         -- 5 --              Wed, 14 Aug 2002 15:59:31

The oil company Pennaco (now Marathon) has since sued the Department of the Interior, and that case is now in federal court. But Norton and Griles don't seem intent on mounting a defense, although the case names them as defendants. On July 18, the Interior Department's solicitors requested reconsideration and a stay. The Wyoming Outdoor Council and others have filed a motion to intervene to ensure a solid defense of the board's decision. "You wonder how hard they're going to defend it," says Wyoming Outdoor Council attorney Tom Darin. Considering what Norton and Griles' old industry buddies stand to lose if the Interior Department wins, it's not surprising.

# The Washington Post

SATURDAY, MAY 25, 2002



# Interior Official's Memo Raises Conflict Issue

By Michael Grunwald
Washington Post Staff Writer

Deputy Interior Secretary J. Steven Griles, a former lobbyist for the coal-bed methane industry, intervened in a recent dispute over a massive coal-bed methane project even though he had signed an agreement recusing himself from issues involving his former clients.

The Interior Department's lawyers concluded last month that Griles did not violate ethics rules or break his recusal agreement when he wrote a memorandum challenging a report critical of America's largest domestic energy exploration project, in Wyoming's Powder River Basin. But they had Griles, the department's number-two official, sign a second agreement specifically disqualifying himself from coal-bed methane issues.

Griles has been a favorite target of liberal activists who decry the large number of Bush administration officials with ties to industries they oversee. But Interior spokesman Mark Pfeifle said that Griles's second recusal agreement was simply designed to "reemphasize" the first and that he did nothing to benefit his former clients.

"His memorandum didn't discuss any specific issues, or any of his former clients," Pfeifle said. "The Griles memo to Environmental Protection Agency Deputy Administrator Linda Fisher complained that a proposed EPA letter criticizing Interior's environmental review of the Powder River project "will create, at best, misimpressions, and possibly impede the ability to move forward in a constructive manner.

In the private sector, Griles had represented the Coal Bed Methane Ad Hoc Committee, an industry consortium, as well as Devon Energy, Redstone and Western Gas Resources, three firms seeking to drill for natural gas trapped in coal deposits in the Powder River Basin. Nancy Zirkin, an environmental strategist—the firm that bought Griles's consultancy when he entered public service—helped arrange a tour of the basin for Interior and EPA officials.

Kristin Sykes, who watches Interior for the environmental group Friends of the Earth, accused Griles of a blatant conflict of interest and criticized the department for approving it.

"It's not surprising that Griles flouted his recusal agreement in order to help out former clients and friends in the mining industry," Sykes said. "The Bush administration hired a fox to guard the hen house—that's been their approach to environmental protection from Day One."

Last August, after contentious Senate confirmation hearings, Griles signed an agreement recusing himself for one year "from any particular matter involving specific parties in which any of my former clients are or represent a party." But he has participated in mountaintop removal coal-mining issues, even though he advised clients on such work. And he has pressed Arch Coal. He has weighed in on a host of energy issues, even though he served more than 40 energy-related clients, from the America Gas Association to the Edison Electric Institute.

The Powder River issue flared up in April, when the EPA's acting regional administrator in Denver, Jack McGraw, gave the agency's worst possible rating to an environmental impact statement (EIS) prepared by Interior's Bureau of Land Management. The BLM had signed off on a plan for more than 39,000 potential gas wells on 8 million acres of rugged ranch land, a key element of the Bush administration's energy plan. But in a stinging letter, McGraw rated the BLM's review "environmentally unsatisfactory" and detailed a series of "inadequacies," including insufficient analysis of potential water-quality and air-quality problems.

That's when Griles fired off his April 12 memo to Fisher, under the subject line of "Proposed EPA Region 8 Letter on Coal Bed Methane—EIS's Prepared by the Department of Interior—Wyoming and Montana." In it, Griles complained that McGraw, a career employee, was taking "this significant action" even though President Bush's political appointee was about to replace him. Griles contended that the EPA had failed to respond to Interior's requests for information and urged Fisher to "consider the best means of addressing EPA's concerns together" instead of releasing McGraw's letter.

In a internal memo dated April 24, Interior lawyers told Griles his memo did not violate ethics rules or his promise to keep out of matters involving former clients, saying it was "procedural in nature and dealt primarily with the relationship between high-level officials of executive agencies." The lawyers said the Griles memo "does not advocate for or against any particular policy position."

"He just asked that high-level officials be assigned to work together to find a solution to a coal-bed methane issue," Pfeifle said. "It could have been any issue."

However, the lawyers also told Griles that "as we discussed you have prior advised memos comparable of the coal-bed methane projects in that may be affected by the EIS, and we agreed that you would not participate in the department's decision on the EIS." On May 8, Griles signed the second recusal agreement, noting that "I have become aware that former clients or representative parties in the development of these EIS's."

Environmentalists scoffed at the implication that Griles had been unaware his coal-bed methane clients might benefit from the Powder River project, or that his memo was simply an effort to promote generic cooperation. The EPA letter had the potential to put the project on hold for a second environmental review, and Griles's memo is not improper, the environmentalists ask, why did he need to "reemphasize" his commitment to avoid conflicts of interest?

"His memorandum was clearly designed to put pressure on the EPA to change their position," said Steve Jones, an attorney for the Wyoming Outdoor



Council. "Getting the EIS do early would clearly benefit his former clients."

Deputy Interior Secretary J. Steven Griles, a former energy-industry lobbyist, had agreed to avoid matters involving his former clients.

TOTAL P.02

MAR - 3 2003

Mr. William J. Snape, III
  Vice President and Chief Counsel
Mr. Kumare Vaswani
  Staff Attorney
Defenders of Wildlife
1101 Fourteenth Street, N.W.
Suite 1400
Washington, D.C.  20005

Dear Mr. Snape and Mr. Vaswani:

This concerns your February 4, 2003, Freedom of Information Act
(FOIA) appeal **(FOIA 2003-091),** which was received in this Office
on February 6, 2003.  Your FOIA appeal is related to your
September 25, 2002, FOIA request to the Department of the
Interior, Office of the Secretary (OS).  In your FOIA request,
you sought copies of several categories of financial documents
concerning Mr. J. Steven Griles, Ms. Holly Hopkins, and
Mr. James Cason.  By letters of December 6, 2002, and January 8,
2003, OS responded to your FOIA request.

Your FOIA appeal pertains to the following three issues:

> **Issue 1:**   the denial on the basis of exemptions (4) and (5)
>           of the FOIA, of certain responsive material;
>
> **Issue 2:**   OS referred one responsive document to the Office
>           of Government Ethics for its review and release
>           determination, and that agency has not contacted
>           you regarding a release determination; and,
>
> **Issue 3:**   OS' response was incomplete.

**Issue 1 Response:**

Your appeal, as it pertains to the withheld documents, is with
the Office of the Solicitor (SOL) for legal review.  The
extraordinarily large number of FOIA appeals that the Department
has received has created a heavy workload which will delay the
Department's response to this issue of your appeal.  Please be
assured that the Department will make every effort to provide you
with a determination on your appeal as soon as possible.  If you
have any questions regarding this issue of your appeal, you may
contact Ms. Darrell Strayhorn at (202) 208-5216.

Sloca Declaration
Exhibit 6

2.

Issue 2 Response:

The subject document is a three-page letter which was issued by
the Office of Government Ethics.  The OS acted appropriately when
it referred the subject document to the Office of Government
Ethics for its review and release determination.  Since this
document was issued by the Office of Government Ethics, the
Department needed to refer it to that agency for a release
determination (43 CFR § 2.22(a)(2)).

In its response letter, OS advised you that if you do not receive
a response you can write or call

     Mr. William Gressman
     Sr. Associate General Counsel
     Office of Government Ethics
     1201 New York Avenue, N.W., Suite 500
     Washington, D.C.  20005

     Telephone number: (202) 208-8000.

**Issue 3 Response**:

The portion of your appeal pertaining to the issue of an
incomplete response is denied.  In response to this issue of your
appeal, the Department contacted OS and directed it to review its
file search, taking into consideration the references that you
made to specific documents, and the specific types of documents
that you are seeking.  The OS has advised the Department that, in
response to your FOIA appeal, it conducted another file search;
however, this second file search did not locate any additional
responsive documents.

The Department is satisfied that OS has met its obligations under
the FOIA by conducting a reasonable search of all files likely to
contain documents responsive to your FOIA request.  The
Department has no reason to question the file searches conducted
by OS.

The FOIA requires an agency to disclose, upon request by any
person, nonexempt documents that are in its possession and are
retrievable by a reasonable search.  An agency is not required
under the FOIA to produce records which it does not have or
cannot locate through a reasonable search.

3.

This is a final determination of your appeal for the Department, as it pertains to Issue 2 and Issue 3. You have the right to seek judicial review, of the determinations of all three issues of your appeal in the United States District Court for the District in which you reside or have your principal place of business, the District in which the records subject to your appeal are located, or the United States District Court for the District of Columbia. However, the Department hopes that you will defer action until a final decision has been reached on the portion of your appeal pertaining to withheld documents.

The Department regrets the delay in responding to Issue 1 of your appeal and appreciates your consideration in this matter.

Sincerely,



William W. Wolf
Freedom of Information Act
Appeals Officer

Enclosure

bcc:  SOL: DStrayhorn
      OS:  SESloca
      PIO: Subj/Rdg
PIO:WWolf:ww:02/20/03:208-5339:H:INT-S-EX-IR-NR.3091